FILED

## IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF INDIANA 2012 AUG -1 AM II: 53

|  |  |
|---|---|
| UNITED STATES OF AMERICA, ) <br> STATE OF INDIANA, ) <br> MICHIGAN DEPARTMENT OF ) <br> ENVIRONMENTAL QUALITY, and ) <br> STATE OF ILLINOIS, ) <br> ) <br>    Plaintiffs, ) <br> ) <br>    v. ) <br> ) <br> UNITED STATES STEEL CORPORATION, ) <br> ) <br>    Defendant. ) | Case No. <br><br> 2  12 C V  3 c 4 |

**COMPLAINT**

Plaintiffs, the United States of America, by authority of the Attorney General of the

United States and on behalf of the United States Environmental Protection Agency ("EPA"), the

State of Indiana, on behalf of the Indiana Department of Environmental Management ("IDEM"),

the Michigan Department of Environmental Quality ("MDEQ"), and the State of Illinois, on

behalf of the Illinois Environmental Protection Agency ("IEPA"), through the undersigned

attorneys, file this Complaint and allege as follows:

**NATURE OF THE ACTION**

1.    This is a civil action brought against Defendant United States Steel Corporation

("U.S. Steel" or "Defendant") pursuant to Sections 113(b), 167 and 304(a)(1) of the Clean Air

Act ("CAA" or the "Act"), 42 U.S.C. §§ 7413(b), 7477 and 7614(a)(1), and pursuant to the laws

of Indiana, Michigan, and Illinois, for injunctive relief and assessment of civil penalties for

violations of the following provisions at the Defendant's three steel mills located in Indiana, Michigan and Illinois:

      a.      The National Emission Standards for Hazardous Air Pollutants ("NESHAP") provisions of the Act, 42 U.S.C. § 7412, and the NESHAP regulations governing: i) Integrated Iron and Steel Manufacturing, codified at 40 C.F.R. Part 63, Subpart FFFFF; and ii) General Provisions at 40 C.F.R Part 63;

      b.      The Prevention of Significant Deterioration ("PSD") provisions of the Act, 42 U.S.C. §§ 7470-96, and the federal PSD regulations set forth at 40 C.F.R. § 52.21;

      c.      The Non-Attainment New Source Review ("NA NSR") provisions of the Act, 42 U.S.C. §§ 7501-15; and the NA NSR implementing federal regulations codified at 40 C.F.R. §§ 52.24, 51.165 and Part 51, Appendix S;

      d.      The provisions of the federally-enforceable state implementation plans ("SIPs") for Indiana, Michigan and Illinois that incorporate the relevant requirements of the NESHAP, PSD and/or NSR NA provisions of the Act, as outlined below; and

      e.      Title V of the Act, 42 U.S.C. §§ 7661-7661f; Title V's implementing federal regulations codified at 40 C.F.R. Part 70; the Michigan Title V Renewable Operating Permit Program, Michigan Administrative Code R 336.1201 through 1218; the Indiana Title V Operating Permit Program, 326 Indiana Administrative Code ("IAC") 2-7; the Illinois Title V Clean Air Act Permit Program (the "CAAPP"), 415 Illinois Codified Statutes ("ILCS") 5/39.5; and the Defendant's Title V Permits, including the Michigan facility's Title V Permit No. 199600132d, the Indiana facility's Permit T089-7663-00121, and the Illinois facility's Title V Permit Application No. 96030056.

2.      The State of Indiana's authority to seek injunctive relief and civil fines with regard to the Defendant's Gary Works facility, located in Gary, Indiana, derives from not only the CAA but also Indiana Code ("IND. CODE") §§ 13-13-5-1 and 13-13-5-2.

3.      MDEQ's authority to seek injunctive relief and civil fines with regard to the Defendant's Great Lakes Works facility, located in Ecorse, Wayne County, Michigan, derives from not only the CAA but also Section 5530 of Michigan's Natural Resources and Environmental Protection Act ("NREPA"), M.C.L. § 5530.

4.      Certain claims in this civil action are brought by the Attorney General of the State of Illinois and at the request of the IEPA, including claims under NESHAP provisions of the Act and regulations governing i) Benzene Emissions from Coke By-Product Recovery Plants, codified at 40 C.F.R. Part 61, Subpart L; ii) Equipment Leaks (Fugitive Emission Sources) codified at 40 C.F.R. Part 61, Subpart V; and (iii) Coke Ovens, codified at 40 C.F.R. Part 63, Subpart CCCCC; and pursuant to Sections 42(d) and (e) of the Illinois Environmental Protection Act, 415 ILCS 5/42(d) and (e) (2012), for injunctive relief and assessment of civil penalties for violations of the Illinois Environmental Protection Act, that Act's implementing regulations, and the CAAPP Permit 96030056 and Operating Permit Nos. 80070016, 95010001, 80050010, 82060043, 88070071, 85030039 for the Defendant's facility located in Granite City, Illinois.

## JURISDICTION, VENUE, AND NOTICE

5.      This Court has jurisdiction over the subject matter and over the parties pursuant to Sections 113(b) and 304(a)(1) of the Act, 42 U.S.C. §§ 7413(b) and 7604(a)(1), and pursuant to 28 U.S.C. §§ 1331, 1345, and 1355(a).

6.     This Court has supplemental jurisdiction over the subject matter and over the parties as to the Illinois State-only claims and claims under Michigan law and Indiana law pursuant to 28 U.S.C. § 1367.

7.     Venue lies in this District pursuant to Section 113(b) of the Act, 42 U.S.C. § 7413(b) and 28 U.S.C. §§ 1391(b), (c) and 1395(a), because the alleged violations occurred within this district and/or Defendant is found within this District.

8.     As required by Section 113(a)(1) of the Act, 42 U.S.C. § 7413(a)(1), the Defendant and the States of Indiana, Illinois, and Michigan have had actual notice of the violations of the requirements or prohibitions of an applicable SIP or permit alleged against the Defendant in this Complaint for at least thirty (30) days before the filing of this Complaint.

9.     Notice of the commencement of this action has been given to the States of Indiana, Illinois, and Michigan, as required by Section 113(b) of the CAA, 42 U.S.C. § 7413(b), and to the EPA Administrato2r and the Defendant as required by Section 304(b) of the Act, 42 U.S.C. § 7604(b).

## DEFENDANT

10.     United States Steel Corporation is a company incorporated in Delaware, with headquarters in Pittsburgh, Pennsylvania.

11.     At times relevant to this Complaint, Defendant has owned and operated a coke, iron and steel manufacturing facility, the U.S. Steel Gary Works facility, located at One North Broadway in Gary, Lake County, Indiana (the "Gary Works Facility").

12.     At times relevant to this Complaint, Defendant has owned and operated an iron and steel manufacturing facility, the U.S. Steel Great Lakes Works facility, located at No. 1 Quality Drive in Ecorse, Wayne County, Michigan (the "Great Lakes Works Facility").

13.    Since May 20, 2003, when U.S. Steel acquired the assets of the Granite City

Works facility from National Steel Corporation by the terms of an Order of the U.S.

Bankruptcy Court for the Northern District of Illinois (*In re: National Steel Corp.*, Case No.

02-08697 through 02-08738 (N.D. Ill. April 21, 2003), Defendant has owned and operated a

coke, iron and steel manufacturing facility, the U.S. Steel Granite City Works facility, located

at 20th and State Street in Granite City, Madison County, Illinois (the "Granite City Works

Facility").

14.    Defendant is a "person" within the meaning of Section 302(e) of the Act, 42

U.S.C. § 7602(e).

## STATUTORY AND REGULATORY BACKGROUND

### Clean Air Act

15.    The CAA establishes a regulatory scheme designed to protect and enhance the

quality of the Nation's air resources so as to promote the public health and welfare and the

productive capacity of its population.  42 U.S.C. § 7401(b)(1).

### The National Ambient Air Quality Standards

16.    Section 109 of the CAA, 42 U.S.C. § 7409, requires EPA to promulgate national

ambient air quality standards ("NAAQS") to protect the public health and welfare for certain

criteria air pollutants from any known or anticipated adverse effects associated with the

presence of the air pollutant in the ambient air.  Pursuant to Section 109, 42 U.S.C. § 7409, at

40 C.F.R. §§ 50.4, 50.6, 50.7, 50.8, 50.9, 50.10 and 50.11, EPA has identified and promulgated

NAAQS for six criteria pollutants: sulfur dioxide ("$SO_2$"),  particle pollution or particulate

matter (including particulate matter less than 2.5 microns and  particulate matter ("PM") less

than 10 microns, i.e., $PM_{2.5}$ and $PM_{10}$, respectively), carbon monoxide ("CO"), lead, ozone (a

precursor for volatile organic compounds ("VOCs")), and nitrogen dioxide ("$NO_2$"), respectively.

17.    Under Section 107(d) of the CAA, 42 U.S.C. § 7407(d), each state is required to designate those areas within its boundaries where the air quality is better or worse than the NAAQS for each criteria pollutant, or where the air quality cannot be classified due to insufficient data. An area that meets the NAAQS for a particular pollutant is an "attainment" area. An area that does not meet the NAAQS is a "non-attainment" area. An area that cannot be classified due to insufficient data is designated as "unclassifiable."

18.    Section 110 of the CAA, 42 U.S.C. § 7410, requires each state to adopt and submit to EPA for approval a SIP that provides for the attainment and maintenance of the NAAQS within the state.

## The Prevention of Significant Deterioration Requirements

19.    Part C of Title I of the CAA, 42 U.S.C. §§ 7470-7492, sets forth requirements for the prevention of significant deterioration of air quality in those areas designated as either attainment or unclassifiable for purposes of meeting the NAAQS standards. These requirements are designed to protect public health and welfare, to assure that economic growth will occur in a manner consistent with the preservation of existing clean air resources, and to assure that any decision to permit increased air pollution is made only after careful evaluation of all the consequences of such a decision and after public participation in the decision making process. These CAA provisions and their implementing regulations at 40 C.F.R. Part 52.21 are referred to herein as the "PSD regulations."

20.    Section 165(a) of the CAA, 42 U.S.C. § 7475(a), and 40 C.F.R. § 52.21(i)(1) (as of March 2003, 40 C.F.R. § 52.21(a)(2)(iii)) prohibit the construction, major modification, and

subsequent operation of a major emitting facility in an area designated as attainment or unclassifiable unless a PSD permit has been issued.

21. Section 169(1) of the CAA, 42 U.S.C. § 7479(1), defines "major emitting facility" as, *inter alia*, iron and steel mill plants which emit or have the potential to emit 100 tons per year ("TPY") or more of any regulated air pollutant.

22. Under the PSD regulations at 40 C.F.R. § 52.21(b)(1)(i)(a), "major stationary source" is defined as, *inter alia*, iron and steel mill plants which emit or have the potential to emit 100 TPY or more of any regulated air pollutant.

23. Under the PSD regulations at 40 C.F.R. § 52.21(b)(2)(i), "major modification" is defined as any physical change in or change in the method of operation of a major stationary source that would result in a significant net emission increase of any pollutant subject to regulation under the CAA. The term modification is defined under Sections 7411(a)(3) and 7479(2)(C), 42 U.S.C. §§ 111(a) and 169(2)(C), to include "any physical change in, or change in the method of operation of, a stationary source which increases the amount of any air pollutant emitted by such source or which results in the emission of any air pollutant not previously emitted."

24. Under the PSD regulations at 40 C.F.R. § 52.21(b)(23)(i), "significant" is defined and, as is pertinent to this Complaint, means: a rate of emissions of $PM_{10}$ that would equal or exceed 15 TPY; a rate of emissions of PM that would equal or exceed 25 TPY; a rate of emissions of $SO_2$, NOx, or VOCs that would equal or exceed 40 TPY; and a rate of emissions of CO that would equal or exceed 100 TPY.

25. Under the PSD regulations at 40 C.F.R. § 52.21(b)(3)(i), "net emissions increase" is defined as "the amount by which the sum of the following exceeds zero: (a) any increase in

actual emissions [as defined by 40 C.F.R. § 52.21(b)(21)] from a particular physical change or change in method of operation at a stationary source; and (b) any other increases and decreases in actual emissions [as defined by 40 C.F.R. § 52.21(b)(21)] at the source that are contemporaneous with the particular change and are otherwise creditable."

26.     Under the PSD regulations at 40 C.F.R. § 52.21(i) (as of March 2003 at 40 C.F.R. § 52.21(a)(2)), an owner or operator must obtain a permit prior to construction of a major stationary source or of a major modification to a stationary source that demonstrates that the owner or the operator has completed the following steps, among others:  (a) installed, and is operating the source with, the best available control technology ("BACT"), as that term is defined at 40 C.F.R. § 52.21(b)(12) and 42 U.S.C. § 7479(3), for each pollutant subject to regulation under the CAA that it would have the potential to emit in significant amounts; (2) demonstrated that the construction of the facility will not cause or contribute to air pollution in violation of any ambient air quality standard or any specified incremental amount; (3) performed an analysis of ambient air quality in the area; and (4) submitted all information necessary to perform any analysis or make any determination required under 40 C.F.R. § 52.21. 40 C.F.R. § 52.21 (j) through (r).

27.     To achieve the objectives of the NAAQS and the Act, Section 110(a) of the Act, 42 U.S.C. § 7410(a), requires each state to submit to the Administrator for approval a SIP that provides for the implementation, maintenance, and enforcement of primary and secondary NAAQS in each air quality control region.

28.     Section 161 of the CAA, 42 U.S.C. § 7471, requires SIPs to contain emission limitations and such other measures as may be necessary, as determined under the regulations

promulgated pursuant to these provisions, to prevent significant deterioration of air quality in attainment areas.

29.     Section 110(a)(2)(C) of the Act requires that SIPs include a program for the enforcement of the PSD provisions of the Act.  42 U.S.C. § 7410(a)(2)(C).  A state may comply with this requirement by having its own regulations approved by EPA, which must be at least as stringent as the regulations set forth at 40 C.F.R. § 51.166.  In the event that EPA approves a SIP, the SIP requirements are federally enforceable under CAA Section 113.  42 U.S.C. § 7413(a)–(b); 40 C.F.R. § 52.23.  If a State does not have a PSD program that has been approved by EPA, the federal PSD regulations set forth at 40 C.F.R. § 52.21 may be incorporated by reference into that state's SIP.  40 C.F.R. § 52.21(a)(1).

30.     On August 7, 1980, EPA disapproved Indiana's proposed PSD program and incorporated by reference the provisions of 40 C.F.R. § 52.21(b) through (w) into the Indiana SIP at 40 C.F.R. § 52.793; 45 Fed. Reg. 52,676, 52,741 (Aug.7, 1980).    On March 3, 2003, EPA conditionally approved Indiana's PSD program, found at 326 IAC 2-2.  68 Fed. Reg. 9,892; and approved in final form on May 20, 2004 (69 Fed. Reg. 29,071).  Indiana subsequently revised portions of its PSD SIP regulations, and those provisions were approved by EPA effective July 18, 2007. 72 Fed. Reg. 33,395.  IDEM has the authority to review and process PSD applications and implement the PSD program in Indiana.

### Non-Attainment New Source Review

31.     Part D of Title I of the CAA, 42 U.S.C. §§ 7501-7515, sets forth SIP requirements for areas designated as non-attainment for the NAAQS.  Sections 110(a)(2)(C) and (I) of the CAA, 42 U.S.C. § 7410(a)(2)(C) and (I), require that each SIP contain a program meeting the requirements of Part D of the CAA or the pre-construction review and permitting of new and

modified stationary sources located in or near areas designated as "non-attainment" for a criteria pollutant pursuant to Section 107(d) of the CAA, 42 U.S.C. § 7407(d). Part D sets forth air quality attainment goal dates and SIP submission dates, as well as the requirement that each SIP must be approved by EPA. These provisions and the implementing regulations codified at 40 C.F.R. §§ 52.24, 51.165 and Part 51, Appendix S, are referred to herein as the NA NSR regulations.

32.     Section 173, 42 U.S.C. § 7503, and the implementing regulations at 40 C.F.R. §§ 52.24, 51.165, and Part 51, Appendix S, provide that anyone proposing to construct a major stationary source or to make a major modification in a non-attainment area may construct or modify only if the SIP permitting requirements are met.

33.     Under the NA NSR regulations at 40 C.F.R. §§ 52.24, 51.165 and Part 51, Appendix S, "major stationary source" is defined as any stationary source of air pollutants that has the potential to emit 100 TPY or more of any pollutant subject to the CAA or any physical change that would occur at a stationary source not qualifying as a major stationary source, if the change would constitute a major stationary source by itself.

34.     Under the NA NSR regulations at 40 C.F.R. §§ 52.24(f)(5)(I), 51.165A.5.(i) and Part 51, Appendix S, II, A.5.(i), "major modification" is defined as any physical change in or change in the method of operation of a  major stationary source that would result in a significant net emission increase of any pollutant subject to regulation under the CAA.

35.     Under the NA NSR regulations at 40 C.F.R. §§ 52.24(f)(10), 51.165(a)(x) and Part 51, Appendix S, II, A.10., "significant" is defined as a rate of emissions of $PM_{10}$ that would equal or exceed 15 TPY, a rate of emissions of CO that would equal or exceed 100 TPY, and a rate of emissions of $SO_2$, NOx, or VOCs that would equal or exceed 40 TPY.

36.     Under the NA NSR regulations at 40 C.F.R. §§ 52.24(f)(6)(i), 51.165A.6.(i) and Part 51, Appendix S, II, A.6., "net emissions increase" is defined as "the amount by which the sum of the following exceeds zero: (a) any increase in actual emissions (as defined by 40 C.F.R. §§ 52.24(f)(13), 51.165(a)(xii)(A) and Part 51, Appendix S, II, A.10) from a particular physical change or change in method of operation at a stationary source; and (b) any other increases and decreases in actual emissions at the source that are contemporaneous with the particular change and are otherwise creditable."

37.     Under the NA NSR regulations at 40 C.F.R. Part 51, Appendix S, II, B., the reviewing authority must examine each proposed major new source and proposed modification to determine, *inter alia*, whether the source will meet all applicable emission requirements in the SIP.

38.     Under the NA NSR regulations at 40 C.F.R. Part 51, Appendix S, IV, A., if the reviewing authority finds that a proposed stationary source or modification is to be constructed in an area that is designated as non-attainment with respect to a pollutant whose "significant net emissions increase" makes such source or modification "major," the source must demonstrate sufficient emission offsets; that the source will comply with the Lowest Achievable Emission Rate ("LAER"); that the owner or operator of the proposed source can demonstrate that all of its major sources within the state are in compliance with their emission limits; that the non-attainment provisions of the SIP are being properly implemented by the State; and that an analysis of alternatives sites, sizes, production processes and environmental controls have been considered, and that the benefits of the proposed source outweigh the environmental and social costs imposed as a result of the construction or modification.

39.    A state or regional air authority may comply with Sections 172 and 173 of the Act, 42 U.S.C. §§ 7502 and 7503, by being delegated by EPA the authority to enforce the NA NSR regulations set forth at 40 C.F.R. Part 51, Appendix S, and 40 C.F.R. § 52.24, or by having its own NA NSR regulations, which must be at least as stringent as those set forth at 40 C.F.R. § 51.165, approved as part of its SIP by EPA.

40.    On February 16, 1982, EPA approved Indiana's NA NSR SIP rules, which were incorporated into Section 19 of the Indiana Air Pollution Code ("APC 19"). 47 Fed. Reg. 6,621 (Feb. 16, 1982). APC 19 governed the preconstruction review of modification of facilities in non-attainment areas that occurred prior to December 6, 1994, when subsequent regulations went into effect. The definitions applicable to the APC 19 NA NSR provisions were codified at 325 IAC 1-1. 46 Fed. Reg. 54,941 (November 5, 1981), and became effective on December 6, 1981.

41.    On February 25, 1994, Indiana submitted revisions to its SIP to satisfy the new NSR requirements of the 1990 Clean Air Act Amendments. On October 7, 1994, EPA approved Sections 2-1 and 2-3 of Chapter 326 of the Indiana Administrative Code, 326 IAC 2-1, 2-3, as SIP revisions replacing APC 19. 59 Fed. Reg. 51,108 (October 7, 1994) (effective December 6, 1994). 40 C.F.R. § 52.770(c)(94). Included in the NSR SIP revisions were changes to the definitions previously codified at 325 IAC 1-1; the definitions now applicable to NSR in Indiana appear at 326 IAC 2-3-1.

### National Emission Standards for Hazardous Air Pollutants

42.    Congress established a list of hazardous air pollutants ("HAPs"). 42 U.S.C. § 7412(b)(1). Pursuant to Section 112(b)(2) of the Act, 42 U.S.C. § 7412(b)(2), EPA

periodically reviews the list of hazardous air pollutants and, where appropriate, revises the list by promulgating rules.

43.   Section 112(c) of the Act, 42 U.S.C. § 7412(c), requires the EPA Administrator to publish a list of all categories and subcategories of major sources and certain area sources of the hazardous air pollutants that are listed in or pursuant to 42 U.S.C. § 7412(b).

44.   Section 112(d) of the Act, 42 U.S.C. § 7412(d), directs the EPA Administrator to promulgate regulations establishing emission standards for each category and subcategory of major sources and area sources of HAPs.  The regulations that establish these emission standards are called NESHAPs.  NESHAPs apply to specific categories of stationary sources that emit or have the potential to emit one or more hazardous air pollutants listed in 40 C.F.R. Part 63 pursuant to Section 112(b) of the Act.   40 C.F.R. § 63.1(a)(2).  A "stationary source" is any building, structure, facility, or installation that emits or may emit any air pollutant.  42 U.S.C. § 7412(a)(3) (by reference to 42 U.S.C. § 7411(a)).  The numerous "source categories" regulated under the specific provisions of the NESHAPs include  iron and steel manufacturing facilities (40 C.F.R. Part 63, Subpart FFFFF); steel pickling facilities (40 C.F.R. Part 63, Subpart CCC); and coke oven batteries (40 C.F.R. Part 63, Subpart L).

45.   The NESHAPs apply to facilities that are "major sources" and "area sources" of HAPs, 40 C.F.R. § 63.1500(b).  Major sources include single stationary sources, as well as groups of stationary sources located within a contiguous area and under common control, that emit or have the potential to emit ten tons per year or more of any HAP or twenty-five tons per year or more of any combination of HAPs.  42 U.S.C. § 7412(a)(1); 40 C.F.R. § 63.2.  An "area source" is any stationary source of HAPs that is not a major source.  42 U.S.C. § 7412(a)(2).

**NESHAP for Integrated Iron and Steel Manufacturing**

46.   On May 20, 2003, EPA promulgated the NESHAP for Integrated Iron and Steel Manufacturing, codified at 40 C.F.R. Part 63, Subpart FFFFF, §§ 63.7780-63.7852.

47.   The Integrated Iron and Steel NESHAP applies to owners and/or operators of any integrated iron and steel manufacturing facility that is a major source of HAPs emissions.  40 C.F.R. § 63.7781.

48.   A source subject to the Integrated Iron and Steel NESHAP must be in compliance with the emissions limitations and operation and maintenance requirements of the NESHAP. 40 C.F.R. § 63.7810.

49.   The owner or operator of a source subject to the Integrated Iron and Steel NESHAP must meet each applicable emission limit and opacity limit in Table 1 of the Integrated Iron and Steel NESHAP.  40 C.F.R. § 63.7790(a).

50.   The Integrated Iron and Steel NESHAP contains the following requirements:

a.   Visible emissions from blast furnace casthouses may not exceed 20% opacity on a six-minute average.  40 C.F.R. §§ 63.7790(a) and 63.7833(a).

b.   Visible emissions at basic oxygen processing ("BOP") furnace shop roof monitors may not exceed 20% opacity on a three-minute average.  40 C.F.R. §§ 63.7790(a) and 63.7833(a).

c.   A source must make monthly inspections of applicable capture systems and take corrective action and record all information needed to document conformance with the requirements.  40 C.F.R. § 63.7834(a)(1).

d.   A source must operate at all times in accordance with a written operations and maintenance plan ("O&M Plan") for each capture system or control device subject to an

operating limit in 40 C.F.R. § 63.7790(b). 40 C.F.R. § 63.7800(b). Specifically, an owner or operator must operate the capture system or control device according to a written O&M Plan that, in part, indicates the level of the ventilation draft and the damper position settings for the capture system or control device. *Id.* The O&M Plan must, at a minimum, set an operating limit parameter for damper positions. 40 C.F.R. § 63.7800(b)(3)(i). For each operating limit parameter selected, the source must designate the value or setting for the parameter at which the capture system operates during the process operation. 40 C.F.R. § 63.7800(b)(3)(ii).

## CAA Title V Requirements and State Title V Programs

51. Title V of the Act, 42 U.S.C. §§ 7661-7661f, establishes an operating permit program for certain sources, including "major sources." The purpose of Title V is to ensure that all "applicable requirements" that a given source must comply with under the Act, including NESHAP requirements, are collected in one place, *i.e.* a Title V operating permit.

52. Federal regulations promulgated pursuant to CAA Title V are codified at 40 C.F.R. Part 70.

53. Pursuant to Section 502 of the Act, no source may operate without a Title V permit that lists all the requirements under the Act that are applicable to the source after the effective date of any permit program approved or promulgated under Title V of the Act. 42 U.S.C. § 7661a(a). 40 C.F.R. § 70.7(b).

54. Section 502 of the Act also requires EPA to promulgate regulations establishing the minimum elements for state permit programs, and requires each state to develop and submit for EPA's approval a permit program under state law. EPA promulgated the minimum requirements for Title V permitting programs and lists approved permitting programs as

required by the Act. 40 C.F.R. Part 70. The Title V permitting program is designed to promote timely and efficient implementation of goals and requirements of the Act.

55.     Indiana's Title V operating permit program was granted final approval by EPA in December 2001, 66 Fed. Reg. 62,969 (Dec. 4, 2001), and is codified in the Indiana Administrative Code at Title 326 IAC 2-7.

56.     On December 4, 2001, EPA approved Michigan's Title V Renewable Operating Permit Program, codified at Michigan Administrative Code R 336.1201 through 1218, R 336.1299, and R 336.1912. MDEQ operates Michigan's program.

57.     Pursuant to Section 502(a) of the Act, 42 U.S.C. § 7661a, it is unlawful for a major source to operate in violation of a permit issued under Title V of the Act, 42 U.S.C. § 7661, *et seq*. Under 40 C.F.R. § 70.7(b), no source subject to 40 C.F.R. Part 70 requirements may operate without a permit as specified in the Act and 40 C.F.R. § 70.6.

58.     Section 503(c) and (d) of the CAA and the Title V federal regulations require the owner or the operator of a covered source to submit a timely and complete permit application that provides the permitting authority with sufficient information to evaluate the source and to identify all applicable requirements under the Act. This information includes: citation to and description of all CAA requirements applicable to the source; a compliance plan for all applicable requirements, including a schedule of compliance and a description of how the source complies or intends to comply with all applicable requirements; and a certification by a responsible official of the truth, accuracy and completeness of the submitted information. 42 U.S.C. § 7661b(c) and (d); 40 C.F.R. § 70.5.

59.     The Title V regulations require an applicant who fails to submit all relevant facts necessary to evaluate the subject source and its Title V application, or who has submitted

incorrect information in a Title V application, upon becoming aware of such failure or incorrect submittal, to promptly submit the appropriate supplementary facts or corrected information. 40 C.F.R. § 70.5(b).

60.    CAA Section 504(a) and the Title V regulations require each Title V permit to contain, among other things, enforceable emission limitations and standards, a schedule of compliance, and other conditions that are necessary to assure compliance with all applicable requirements under the Act, including any applicable PSD and NA NSR requirements. 42 U.S.C. § 7661c(a); 40 C.F.R. §§ 70.6(a)(1) and 70.1(b).

## STATUTORY AND REGULATORY BACKGROUND RELEVANT ONLY TO STATE OF ILLINOIS CLAIMS

### NESHAP for Coke Ovens

61.    On April 15, 2005, EPA promulgated the NESHAP for Coke Ovens, codified at 40 C.F.R. Part 63, Subpart CCCCC, §§ 63.7280-63.7352.

62.    The NESHAP for Coke Ovens applies to owners and/or operators of a coke oven battery at a coke plant that is a major source of HAPs emissions. 40 C.F.R § 63.7281.

63.    The NESHAP for Coke Ovens covers emissions from pushing, soaking, quenching, and battery stacks at each coke oven battery. 40 C.F.R. § 63.7282.

64.    A source subject to the NESHAP for Coke Ovens must be in compliance with the emissions limitations and operation and maintenance requirements of the NESHAP. 40 C.F.R. § 63.7283.

### Illinois Environmental Protection Act

65.    Section 9(a) of the Illinois Environmental Protection Act, 415 ILCS 5/9(a), provides as follows: "No person shall cause or threaten or allow the discharge or emission of any contaminant into the environment in any State so as to cause or tend to cause air pollution

in Illinois, either alone or in combination with contaminants from other sources, or so as to violate regulations or standards adopted by the Board under this Act."

66.     Section 9(b) of the Illinois Environmental Protection Act, 415 ILCS 5/9(b), provides as follows: "No person shall construct, install, or operate any equipment, facility, vehicle, vessel, or aircraft capable of causing or contributing to air pollution or designed to prevent air pollution, of any type designated by Board regulations, (1) without a permit granted by the Agency unless otherwise exempt by this Act or Board regulations or (2) in violation of any conditions imposed by such permit."

67.     Section 9.1(d)(1) of the Illinois Environmental Protection Act, 415 ILCS 5/9.1(d)(1), provides as follows: "No person shall violate any provisions of Sections 111, 112, 165 or 173 of the CAA, as now or hereafter amended, or federal regulations adopted pursuant thereto…"

68.     Section 39.5(6) of the Illinois Environmental Protection Act, 415 ILCS 5/39.5(6), provides, in part, as follows: "It shall be unlawful for any person to violate any terms or conditions of a permit issued under this Section, to operate any CAAPP source except in compliance with a permit issued by the Agency under this Section or to violate any other applicable requirements…"

### ENFORCEMENT PROVISIONS RELEVANT TO THE UNITED STATES

69.     Section 113(b) of the Act, 42 U.S.C. § 7413(b), authorizes the United States to commence a civil action for a permanent or temporary injunction, and/or for the assessment of a civil penalty of up to $25,000 per day for each violation whenever any person violates any requirement of the Act. The Federal Civil Penalties Inflation Adjustment Act of 1990, 28 U.S.C. § 2641, as amended by the Debt Collection Improvements Act of 1996, 31 U.S.C. §

3701, required the U.S. EPA to adjust penalties for inflation on a periodic basis. Pursuant to 40 C.F.R. Part 19, the United States may seek civil penalties of up to $27,500 per day for each violation occurring from January 31, 1997 through March 15, 2004; up to $32,500 per day for each violation occurring from March 16, 2004 through January 12, 2009; and up to $37,500 per day for each violation occurring on or after January 13, 2009.

### ENFORCEMENT PROVISIONS RELEVANT TO STATES

70.     Section 304(a)(1) of the Act, 42 U.S.C. § 7604(a)(1), authorizes the States of Indiana, Michigan, and Illinois to commence a civil action against any person who is alleged to have violated an emission standard or limitation under the Act.

71.     Section 42(d) and (e) of the Illinois Environmental Protection Act, 415 ILCS 5/42(d) and (e), authorizes the State of Illinois to commence a civil action against any person who is alleged to have violated the Illinois Environmental Protection Act, any rule or regulation adopted under the Act, or any permit or term or condition of a permit. Section 42(a) of the Illinois Environmental Protection Act, 415 ILCS 42(a), authorizes a monetary penalty of up to $50,000 for each violation of the Illinois Environmental Protection Act and implementing regulations, and up to an additional $10,000 for each day that such violations continue.

72.     Pursuant to Section 5530 of Part 55 of NREPA, M.C.L. § 5530, MDEQ may seek injunctive relief and a civil fine of up to $10,000 for each violation of Part 55 of NREPA, a rule promulgated under Part 55 of NREPA, and a permit issued under Part 55 of NREPA.

73.     Pursuant to IND. CODE §§ 13-13-5-1 and 13-13-5-2, Indiana may seek injunctive relief and civil penalties for the violations alleged herein. In addition, pursuant to IND. CODE § 13-30-4-1, IDEM may recover a civil penalty not to exceed $25,000 per day of any violation of air pollution control laws in a civil action commenced in any court with jurisdiction.

## GENERAL ALLEGATIONS

74.   The Gary Works Facility, the Great Lakes Works Facility and the Granite City Works Facility are iron, steel and coke manufacturing facilities and "integrated iron and steel manufacturing" facilities as defined in 40 C.F.R. Part 63, Subpart FFFFF.

75.   Defendant is, and at all relevant times has been, the "owner" and "operator" of the Gary Works Facility, the Great Lakes Works Facility and the Granite City Works Facility within the meaning of Section 112(a)(9) of the Act, 42 U.S.C. § 7412(a)(9), and the federal, state, and local regulations promulgated pursuant to the Act.

76.   At all times relevant to this Complaint, the Defendant's facilities have processed raw material, including iron ore, limestone and coke, into iron and steel to produce a wide variety of industrial and consumer steel products.

77.   The Gary Works Facility, the Great Lakes Works Facility and the Granite City Works Facility are "stationary sources" as defined in Sections 111(a)(3) and 112(a)(3) of the Act, 42 U.S.C. §§ 7411(a)(3) and 7412(a)(3), and in the federal, state, and local regulations promulgated pursuant to the Act.

78.   At all times relevant to this Complaint, the Gary Works Facility, the Great Lakes Works Facility and the Granite City Works Facility are and/or have been "major sources" as defined in Section 112(a)(1) of the Act, 42 U.S.C. § 7412(a)(1), and in the federal, state, and local regulations promulgated pursuant to the Act.

79.   EPA issued Notices of Violation ("NOVs") to U.S. Steel, in accordance with Section 113(a) of the CAA, 42 U.S.C. § 7413(a), alleging CAA violations asserted herein. Specifically, EPA issued: a) three NOVs regarding the Gary Works Facility on June 25, 2008; April 9, 2009; and June 17, 2011 (EPA-5-08-20-IN, EPA-5-09-10-IN, EPA-5-11-IN-04); 2)

two NOVs regarding the Great Lakes Works Facility on September 30, 2009, and June 17, 2011 (EPA-5-09-MI-16, EPA-5-11-MI-05); and 3) an NOV regarding the Granite City Works Facility on September 30, 2009 (EPA-5-09-21-IL).

## FIRST CLAIM FOR RELIEF: Gary Works – PSD and NA NSR Violations for Blast Furnace No. 4:

(42 U.S.C. § 7475(a) and 7503; 40 C.F.R. Part 51, Appendix S and 40 C.F.R. §§ 52.21 and 52.24; 326 IAC 2-2 and 2-3)

80.     Paragraphs 1 through 79 are realleged and incorporated herein by reference.

81.     At relevant times, the Gary Works Facility's Blast Furnace No. 4 has been a "major stationary source" and a "major emitting facility" within the meaning of the PSD provisions of the Act, 40 C.F.R. § 52.21(b)(1)(i)(a); 42 U.S.C. § 7479(1).

82.     At relevant times, the Gary Works Facility Blast Furnace No. 4 has been a "major stationary source" under the NA NSR provisions of the Act, 40 C.F.R. §§ 52.24, 51.165 and Part 51, Appendix S, and the applicable provisions of the Indiana SIP, 326 IAC 2-3-1.

83.     EPA and the State of Indiana have conducted investigations of Defendant's Blast Furnace No. 4, which included an analysis of relevant information obtained from the Defendant concerning construction and operation of the Blast Furnace and production and emissions data.

84.     Based on EPA's and the State's investigation, information and belief, in or around 1990, Defendant made a "modification," within the meaning of CAA Sections 7411(a) and 7479(2)(C), 42 U.S.C. §§ 111(a) and 169(2)(C), to Blast Furnace No. 4.  The modification consisted of physical changes to Blast Furnace No. 4, which included but are not limited to upgrading of the cooling system, as described in EPA's NOV issued to Defendant on June 25, 2008, at Paragraph 25.  The physical changes are more specifically described in a document

submitted by U.S. Steel to EPA, dated January 7, 2008, as Attachment 1 in response to an EPA Request for Information under Section 114 of the CAA, 42 U.S.C. § 114, dated October 26, 2007.

85.    Upon information and belief, the modification referred to in the previous two paragraphs was a "major modification" that caused a "significant net emissions increase" of $NO_x$ and/or $SO_2$ and/or PM and/or $PM_{10}$ within the meaning of the PSD and NA NSR provisions. 40 C.F.R. §§ 52.21(b)(2)(i), 52.21(b)(23)(i) and (b)(3)(i); 40 C.F.R. §§ 52.24(f), 51.165 and Part 51, Appendix S, II.

86.    Upon information and belief, at various times during the period 1990 to present, Defendant has been in violation of Section 165(a) of the Act, 42 U.S.C. § 7475(a); the implementing regulations at 40 C.F.R. § 52.21; and the corresponding Indiana SIP, 326 IAC 2-2, by commencing a major modification without undergoing PSD review for major modifications, obtaining a PSD permit, and installing and operating BACT for control of the relevant air pollutants.

87.    Upon information and belief, at various times during the period 1990 to present, Defendant has been in violation of Section 173 of the Act, 42 U.S.C. § 7503; the implementing regulations at 40 C.F.R. Part 51, Appendix S and 40 C.F.R. § 52.24; and the corresponding SIP for NA NSR, APC 19, 326 IAC 2-3, by commencing a major modification without undergoing NA NSR review for major modifications, obtaining an NA NSR permit, and installing and operating LAER for control of such air pollutants.

88.    Unless restrained by an Order of the Court, these violations of the Act and the implementing regulations are likely to continue.

89.   As provided in CAA Section 113(b), 42 U.S.C. § 7413(b), and Section 167 of the

Act, 42 U.S.C. § 7477, the Federal Civil Penalties Inflation Adjustment Act of 1990, 28 U.S.C.

§ 2461, as amended by 31 U.S.C. § 3701, and 40 C.F.R. § 19.4, the violations set forth in this

Claim for Relief subject Defendant to injunctive relief and civil penalties of up to $32,500 per

day for each violation occurring between March 16, 2004 and January 12, 2009; and up to

$37,500 per day for each violation occurring after January 12, 2009.

### SECOND CLAIM FOR RELIEF: Gary Works - Opacity Violations

(Integrated Iron and Steel NESHAP, 40 C.F.R. Part 63, Subpart FFFFF; Gary Works Title V
Permit; and Indiana SIP)

90.   Paragraphs 1 through 79 are realleged and incorporated herein by reference.

91.   Indiana, like every other state, must adopt and submit for EPA approval a State

Implementation Plan, providing for the implementation, maintenance and enforcement of the

NAAQS (Indiana SIP).  42 U.S.C. § 7410.

92.   On August 15, 2002, the general opacity limitations at 326 IAC 5-1-2 became

federally effective as part of the Indiana SIP.  Generally, these opacity limitations apply to

visible emissions emitted by or from a facility or source.  326 IAC 5-1-1(a).

93.   In accordance with the Gary Works Title V permit, Defendant is required to

certify and submit Quarterly Deviation and Compliance Monitoring  Reports ("Quarterly

Deviation Reports") identifying any deviation from the Title V permit requirements.

Defendant submitted such reports to EPA.  Defendant is also required to submit Environmental

Incident Reports to IDEM.  Together, the Quarterly Deviation Reports and the Environmental

Incident Reports (collectively, "U.S. Steel Reports") identified exceedances of the opacity

limits described in the preceding paragraph at the Gary Works Facility's Nos. 4, 6, 8, and 14

Blast Furnace casthouses; No. 1 Basic Oxygen Processing Shop ("BOP Shop") Roof Monitor; No. 2 Q-BOP Shop Roof Monitor; and coke processing equipment.

94.    The Indiana SIP requires that visible emissions from a facility located in Lake County shall not exceed an average of 20% opacity in any one (1) six (6)-minute average period. 326 IAC 5-1-2. This requirement is incorporated into Condition C.1(a) of the Defendant's Indiana Title V permit T-089-7663-00121, issued on August 18, 2006 ("Gary Works Title V Permit").

95.    On at least eleven occasions between February 6, 2007 and November 14, 2007, U.S. Steel Reports identified visible emissions opacity above 20%, and up to 40.60%, from one or more of the following furnaces:  Nos. 4, 6, 8 or 14 Blast Furnace. Each opacity exceedance from each of those furnaces is a separate violation of 40 C.F.R. § 63.7833(a), Condition C.1(a) of the Gary Works Title V permit, and the Indiana SIP at 326 IAC 5-1-2.

96.    Between August 18, 2006 and December 31, 2007, U.S. Steel Reports identified, using its continuous opacity monitoring system ("COMS"), 18  periods of time (in most cases consisting of 90 days each) consisting of a total of 15,113 violations  in which visible emissions exceeded 20% opacity on a six-minute average from its Nos. 2, 5 and 7 Coke Battery Underfire Stacks. 326 IAC 5-1-2 of the Indiana SIP and the Gary Works' Title V permit Condition C.1(a). These violations equate to a total of 90,678 minutes of visible emission exceedances from those Coke Oven Battery Underfire Stacks.

97.    The Indiana SIP requires that visible emissions from a facility located in Lake County shall not exceed 60% for more than a cumulative total of fifteen minutes in a six-hour period from coke processing equipment. 326 IAC 5-1-2. This requirement is incorporated into Conditions C.1(b) and D.2.5(i) of the Gary Works Title V Permit.

98.    On at least five occasions between September 28, 2006 and December 18, 2007, US Steel Reports identified visible emissions opacity of greater than 60% during a cumulative total of fifteen minutes in a six-hour period from coke processing equipment. Each opacity exceedance from each coke processing equipment is a separate violation of 326 IAC 5-1-2 of the Indiana SIP and Conditions C.1(b) and D.2.5(i) of the Gary Works Title V Permit.

99.    The Indiana SIP requires that the Gary Works Facility meet the following opacity limits: 20% opacity on a three-minute average at the No. 1 BOP Shop and No. 2 QBOP Shop Roof Monitors and 20% opacity on a six-minute average at the No. 1 BOP Shop north gas cleaner stack. 326 IAC 6.8-3-4. These opacity limits are incorporated in Conditions D.8.4(b), D.9.4(c) and D.8.4(c) of the Gary Works Title V permit.

100.    On at least twelve occasions between December 19, 2006 and January 15, 2007, U.S. Steel Reports identified visible emissions from the No. 1 BOP Shop Roof Monitor or the No. 2 Q-BOP Shop Roof Monitor that exceeded the 20% opacity limit described in the preceding Paragraph and ranged up to 92.08% opacity on a three minute average. Each opacity exceedence from the No. 1 BOP Shop Roof Monitor or the No. 2 Q-BOP Shop Roof Monitor is a separate violation of Conditions D.8.4(b) and D.9.4(c) of the Gary Works Title V permit, and the Indiana SIP at 326 IAC 6.8-3-4.

101.    On May 18, 2007, U.S. Steel Reports identified visible emissions opacity of 32.5% from U.S. Steel's No. 1 BOP Shop North Gas Cleaner Stack. This opacity exceedance is a violation of 326 IAC 6.8.3-4 of the Indiana SIP and U.S. Steel's Title V permit Condition D.8.4(c).

102.    The visible emissions limitations in the Indiana SIP at 326 IAC 6.8-9-3(a)(1) apply to sources located in Lake County, Indiana, including coke batteries. No visible

emissions shall be permitted from more than 10% of the observed coke oven doors on any coke oven battery. 326 IAC 6.8-9-3(a)(1). This opacity limit is incorporated into Condition D.2.4(a) of the Gary Works Title V permit.

103. On at least ten occasions between August 25, 2006 and October 19, 2007, U.S. Steel Reports identified visible emissions opacity from coke oven doors of the Gary Works Facility's coke oven batteries ranging from 10.14% to 21.70%, including but not limited to the doors of No. 5 Coke Oven Battery and No.7 Coke Oven Battery. Each opacity exceedence from each coke oven battery is a violation of Indiana SIP at 326 IAC 6.8-9-3(a)(1) and Condition D.2.4(a) of the Gary Works Title V permit.

104.     The opacity of visible emissions during a pushing operation from a coke battery in sources located in Lake County, Indiana shall not exceed 20%. 326 IAC 6.8-9-3(a). Six (6) consecutive readings shall be averaged to determine the opacity. This opacity limit is incorporated into Condition D.2.4(c) of the Gary Works Title V permit.

105. On at least twenty occasions between October 30, 2006 and November 18, 2007, U.S. Steel Reports identified visible emissions opacity in excess of 20% and ranging up to 46.67% from pushing operations at one of the Gary Works' coke oven batteries, including but not limited to Nos. 2, 5 and 7 Coke Oven Batteries. Each opacity exceedance from pushing operations of each coke oven battery is a violation of Indiana SIP at 326 IAC 6.8-9-3(a)(3) and Condition D.2.4(c) of the Gary Works Title V permit.

106. The Indiana SIP, as applicable to the Gary Works Facility, requires that the opacity of fugitive particulate emissions from continuous transfer of material onto and out of storage piles shall not exceed 10% on a three-minute average. 326 IAC 6.8-10-3(4). This requirement is incorporated into Condition C.5(a)(5) of the Gary Works Title V permit.

107. On May 17, 2007, EPA took visible emission opacity readings using Method 9 at the Defendant's No. 8 Slag Pit during the dumping of slag from the slag runner into the pit at the Gary Works Facility.   The visible emission readings showed opacity of 17.5% and 16.5% on a three-minute average in violation of the Indiana SIP, 326 IAC 6.8-10-3(4), and Condition C.5(a)(5) of the Gary Works Title V permit.

108. The Indiana SIP, as applicable to the Gary Works Facility, requires that there shall be a 0% frequency of visible emission observations of a material during the implant transportation of material by truck or rail at any time.  326 IAC 6.8-10-3(6)(A).  This requirement is incorporated into Condition C.5(a)(7) of the Gary Works Title V permit.

109. On May 14 and 15, 2007, EPA personnel witnessed several smoking hot iron transfer railcars (bottle cars) using Method 22 at the Gary Works Facility.  Because there was not 0% frequency of visible emission observations of a material from the hot iron transfer railcars, the smoking hot iron transfer railcars are violations of the Indiana SIP, 326 IAC 6.8-10-3(6)(A), and Condition C.5(a)(7) of the Gary Works Title V permit.

110. The Indiana SIP, as applicable to the Gary Works Facility, requires that there shall be a 0% frequency of visible emission observations from a building enclosing all or a part of the material processing equipment except from a vent in the building.  326 IAC 6.8-10-3(7)(D).  This requirement is incorporated into Condition C.5(a)(9) of the Gary Works Title V permit.

111. On at least fourteen occasions between May 14, 2007 and December 7, 2007, EPA personnel or the Defendant observed, including using Method 22, visible emissions from a building enclosing all or a part of the material processing equipment except from a vent in the building, including but not limited to:  slag skimming operations exiting the No. 2 Q-BOP

Shop; the casting and filling operations at the No. 4 Blast Furnace; and the casting and filling operations at the No. 8 Blast Furnace. Because there was not 0% frequency of visible emission observations from a building enclosing all or part of the material processing equipment except from a vent in the building, the visible emissions from slag skimming operations exiting the No. 2 Q-BOP Shop; the casting and filling operations at the No. 4 Blast Furnace; and the casting and filling operations at the No. 8 Blast Furnace, the Defendant has violated the Indiana SIP, 326 IAC 6.8-10-3(7)(D), and Condition C.5(a)(9) of the Gary Works Title V permit on each occasion described in this Paragraph.

112. The Indiana SIP, as applicable to the Gary Works Facility, requires that no visible emissions shall be permitted from more than 5% of the total offtake piping on any coke oven battery within Lake County, Indiana. 326 IAC 11-3-2(d)(5). This requirement is incorporated into Condition D.2.5(c) of the Gary Works Title V permit.

113. On at least seven occasions between August 23, 2006 and August 13, 2007, U.S. Steel Reports identified visible emissions of the total offtake piping at one of the Defendant's coke oven batteries, including but not limited to No. 2 Coke Oven Battery, that exceeded the applicable visible emissions limit described in the preceding Paragraph and ranged up to 6.98%. Each opacity exceedance of visible emissions limits from the total offtake piping from each of the coke oven batteries at the Gary Works Facility is a separate violation of Indiana SIP at 326 IAC 11-3-2(d)(5) and Condition D.2.5(c) the Gary Works' Title V Permit.

114. Gary Works' Title V permit requires that fugitive emissions from iron beaching (placing iron on the ground) shall comply with the emission limitations in permit Condition C.5, which in relevant part restates the provisions in the Indiana SIP at 326 IAC 6.8-10.

115. Fugitive opacity from sources in Lake County, Indiana that are not explicitly listed elsewhere in permit Condition C.5 and thus do not have an explicit opacity limit shall not exceed an average of 20% in any one three-minute period, or over the period of the operation if the operation is less than three minutes. Gary Works Title V Permit Condition C.5(a)(12). Iron beaching, furnace top emissions and furnace relief valves are not listed in Condition C.5(a).

116. On December 14, 2009, Defendant identified visible emissions of 30% as a three-minute average resulting from beaching iron. This opacity exceedance is a violation of the Indiana SIP at 326 IAC 6.8-10-3(9) and Condition C.5(a)(12) of the Gary Works Title V permit.

117. On December 15, 2009, Defendant identified visible emissions of 22% as a three minute average from the No. 14 Blast Furnace relief valves. This opacity exceedance is a violation of the Indiana SIP at 326 IAC 6.8-10-3(9) and Condition C.5(a)(12) of the Gary Works Title V permit. Because the Defendant has demonstrated the ability to open relief valves for planned activities while generating little to no opacity, and to avoid unplanned relief valve openings and/or to emit little to no opacity during unplanned relief valve openings, this opacity exceedance indicates a failure to use good air pollution control practices for minimizing emissions, and, as such, is also a violation of 40 C.F.R. Part 63.7800(a), 40 C.F.R. Subpart FFFFF.

118. On December 15, 2009, Defendant identified visible emissions of 23.9% over the period of the equalization operation occurring at the No. 4 Blast Furnace top. This opacity exceedance is a violation of the Indiana SIP at 326 IAC 6.8-10-3(9) and Condition C.5(a)(12) of the Gary Works Title V permit.

119.   Unless restrained by an Order of the Court, these violations of the Act, the implementing regulations, the Gary Works Title V Permit, and the Indiana SIP are likely to continue.

120.   As provided in Section 113(b) of the Act, 42 U.S.C. § 7413(b), and Section 167 of the Act, 42 U.S.C. § 7477, and pursuant to the Federal Civil Penalties Inflation Adjustment Act of 1990, 28 U.S.C. § 3701, and 40 C.F.R. § 19.4, the violations set forth above subject Defendant to injunctive relief and civil penalties of up to $25,000 per day for each violation occurring on or before January 30, 1997; up to $27,500 per day for each such violation occurring on or after January 31, 1997 and up to and including March 15, 2004; up to $32,500 per day for each such violation occurring on or after March 16, 2004 and up to and including January 12, 2009; and up to $37,500 per day for each such violation occurring after January 12, 2009.

## THIRD CLAIM FOR RELIEF: Gary Works - Violations of Gary Works Title V Operational Permit

(Title V of the CAA and regulations: 42 U.S.C. §§ 7661–7661f; 40 C.F.R. Part 70)

121.   Paragraphs 1 through 79 are realleged and incorporated herein.

122.   At all times relevant to this Complaint, Gary Works Facility has been a "major source" under the CAA Title V, 42 U.S.C. §§ 7661(2) and 7602(j), the Title V regulations, 40 C.F.R. § 70.2, and Indiana's Part 70 Permit Program at 326 IAC 2-7.

123.   On August 18, 2006, IDEM issued the Gary Works Title V Permit to the Defendant.  The Gary Works Title V Permit included all of the limits and requirements under the Indiana SIP and the Integrated Iron and Steel NESHAP that are applicable to the Gary Works Facility.  Thus, any violation of those limits and requirements are also violations of the Gary Works' Title V permit and Title V of the CAA.

124.   Title V regulations and the Indiana SIP provide that the owner or operator of each source subject to Title V shall submit a timely and complete permit application in accordance with the requirements of Part 70.   40 C.F.R. § 71.5.   Specifically, each Title V permit application must, in part, identify and describe all points of emissions of regulated pollutants and the emissions from those points, or emission units.   40 C.F.R. § 71.5(c)(3); 326 IAC 2-7-4(c)(3).   An "emissions unit" is any part or activity of a stationary source that emits or has the potential to emit any regulated air pollutant or any pollutant listed under Section 112(b) of the CAA.   326 IAC 2-7-1(14).   The Permit application must also include the citation and description of all applicable requirements and other specific information that may be necessary to implement and enforce applicable requirements of the CAA or to determine the applicability of such requirements including, but not limited to, the requirement to install BACT or LAER for control of relevant pollutants, as described above.   Failure to include this information is a violation of Title V of the Act and 40 C.F.R. § 70.5.

125.   Because U.S. Steel did not include the requirements described in the preceding paragraph, the application for the Gary Works Title V Permit submitted to IDEM on December 16, 1996, did not contain sufficient information for IDEM to evaluate the Gary Works Facility and identify all the CAA requirements applicable to the Gary Works Facility, including:  the citation to and the description of all PSD and NSR NA requirements applicable to the source; a compliance plan for all the applicable requirements, including a schedule of compliance and a description of how the Gary Works Facility complies or intends to comply with all applicable requirements; and a certification by a responsible official of the truth, accuracy and completeness of the submitted information, as required by CAA Section 503(c) and (d), 42 U.S.C. § 7661b(c) and (d); Title V regulations at 40 C.F.R. § 70.5.

126. Because the Defendant had not complied with the requirements described in the previous two paragraphs, the Gary Works Title V Permit does not include the PSD and NA NSR requirements that became applicable to the Gary Works Facility through the implementation of the modification to Blast Furnace No. 4 described in the First Claim for Relief above, including but not limited to operating the Facility in accordance with BACT or LAER standards for control of relevant pollutants, and other enforceable emissions limitations and standards, as required by CAA Sections 502(a) and 504(a), 42 U.S.C. §§ 7661a(a) and 7661c(a); and Title V regulations, 40 C.F.R. §§ 70.6(a)(1) and 70.1(b).

127. Because Defendant failed to submit a complete application for the Gary Works Facility and has been operating the Gary Works Facility with a Title V Permit that does not contain all applicable CAA requirements, as described above, Defendant has violated and, unless enjoined by the Court, will continue to violate: (1) the Title V provisions of the Act, 42 U.S.C. §§ 7661–7661f, including Sections 502(a), 503(c) and (d), and 504(a), 42 U.S.C. §§ 7661a(a), 7661b(c) and (d), and 7661c(a); and (2) the Title V regulations, 40 C.F.R. Part 70, including 40 C.F.R §§ 70.1, 70.5 and 70.6.

128. Based on EPA's review, Defendant failed to identify and describe in its Title V permit application the Nos. 4, 6, and 8 Blast Furnace relief valves as emission points and list the emission from those relief valves, in violation of 40 C.F.R. § 71.5(c)(3) and 326 IAC 2-7-4(c)(3).

129. Gary Works Title V Permit requires that the blast furnace gas distribution system flare controls shall be in operation and the pilot flame present at all times when the blast furnaces are in operation to minimize emissions of CO. Gary Works Title V Permit Condition D.7.9(b).

130.  Based on its response to a December 7, 2007 request for information issued by EPA, the Defendant failed to ensure a pilot flame was always present at the blast furnace gas flares on at least 175 occasions in 2006 and 128 occasions in 2007, in violation of Condition D.7.9(b) of the Gary Works Title V permit.

131.  Gary Works Title V Permit requires that the No. 14 Blast Furnace Casthouse baghouse be in operation at all times during casting operations at the No. 14 Blast Furnace Casthouse, such that it captures particulate emissions generated by the casting operations. Gary Works Title V Permit Condition D.7.9(a)(2).

132.  Observations by EPA inspectors showed that on May 15, 2007, Defendant failed to utilize the No. 14 Blast Furnace Casthouse baghouse to control emissions from the No. 14 Blast Furnace casting operations, when 1) Defendant allowed the baghouse suction for the No. 2 Taphole, slag spout and slag runner to terminate, allowing PM to go uncontrolled; and 2) Defendant failed to utilize the baghouse to control visible emissions from the cover over the dam at the end of No. 2 Taphole's runner.  These observed failures to ensure that the No. 14 Blast Furnace Casthouse baghouse was in operation at all times during casting operations is a violation of Condition D.7.9(a)(2) of the Gary Works Title V Permit.

133.  Gary Works Title V Permit requires the Defendant to operate in compliance with the NESHAP Subpart FFFFF for the sinter plant, blast furnaces, BOP Shop, and Q-BOP shop. Gary Works Title V Permit Conditions D.6.1, D.7.1, D.8.1 and D.9.1.

134.  Defendant's O&M Plans, developed pursuant to 40 C.F.R. Part 63, Subpart FFFFF, dated May 22, 2006, does not contain operating parameter limits for the damper positions at which the No. 14 Blast Furnace, No. 1 BOP Shop and No. 2 Q-BOP Shop capture systems must operate, in violation of 40 C.F.R. § 63.7800(b)(3).  These deficiencies are also in

violation of Conditions D.7.1 (No. 14 Blast Furnace), D.8.1 (No. 1 BOP Shop capture system) and D.9.1 (No. 1 BOP Shop capture system) of the Gary Works Title V Permit.

135.   Unless restrained by an Order of the Court, these violations of the Act, implementing regulations and the Gary Works Title V Permit are likely to continue.

136.   As provided in Section 113(b) of the Act, 42 U.S.C. § 7413(b), and Section 167 of the Act, 42 U.S.C. § 7477, and pursuant to the Federal Civil Penalties Inflation Adjustment Act of 1990, 28 U.S.C. § 3701, and 40 C.F.R. § 19.4, the violations set forth above subject Defendant to injunctive relief and civil penalties of up to $25,000 per day for each violation occurring on or before January 30, 1997; up to $27,500 per day for each such violation occurring on or after January 31, 1997 and up to and including March 15, 2004; up to $32,500 per day for each such violation occurring on or after March 16, 2004 and up to and including January 12, 2009; and up to $37,500 per day for each such violation occurring after January 12, 2009.

### FOURTH CLAIM FOR RELIEF: Great Lakes Works - Opacity Violations

(Integrated Iron and Steel NESHAP, 40 C.F.R. Part 63, Subpart FFFFF; Michigan SIP; Great Lakes Works Title V Permit Conditions)

137.   Paragraphs 1 through 79 are realleged and incorporated herein by reference.

138.   The Michigan State Implementation Plan, as approved by EPA, is codified at 40 C.F.R. §§ 52.1170 *et seq.*

139.   EPA approved Michigan Administrative Code R 336.1301 and 1331, known as the Iron and Steel Particulate Matter SIP rules, as part of the federally enforceable Michigan SIP on June 1, 2006.

140.   R 336.1210 of Michigan's Title V Renewable Operating Permit Program provides that a person shall not operate any emission units located at a stationary source required to

obtain a renewable operating permit except in compliance with all applicable terms and conditions of a renewable operating permit.

141.  The Great Lakes Works Title V Permit incorporates R 336.1364(2), approved by EPA on June 11, 1992 as part of the federally enforceable SIP, which prohibits visible emissions exceeding 20% opacity from BOP Shop roof monitors at a steel manufacturing facility on a three-minute average.  40 C.F.R. § 63.7790(a); R 336.1364(2) of the Michigan SIP and Great Lakes Works Title V Permit Condition E-01.18.II.B.2.

142.  On at least six occasions between September 11, 2006 and November 5, 2008, Defendant reported visible emissions at the Great Lakes Works BOP Shop roof monitor in excess of 20% opacity on a three-minute average.  These opacity exceedances are each a separate violation of 40 C.F.R. § 63.7790(a); R 336.1364(2) of the Michigan SIP and Great Lakes Works Title V Permit Condition E-01.18.II.B.2.

143.  Visible emissions from the slag skimming exiting the BOP Shop roof monitor of the Great Lakes Works Facility must not exceed 10% opacity on a three-minute average.  R 336.1201(3) of the Michigan SIP and Great Lakes Works Title V Permit Condition E-01.16.II.B.3.

144.  On August 26, 2008, using Method 9 test protocol, EPA observed visible emissions of 11% on a three-minute average from slag skimming exiting the BOP Shop roof monitor.  This opacity exceedance is a violation of R 336.1201(3) of the Michigan SIP and Great Lakes Works Title V Permit Condition E-01.16.II.B.3.

145.  The Great Lakes Works Title V Permit incorporates Section 5524 of NREPA, approved by EPA on April 13, 1998 as part of the federally enforceable SIP, which requires that a person responsible for any fugitive dust source regulated under that section shall not

cause or allow the emission of fugitive dust from any road, lot or storage pile, including any material handling activity at a storage pile, that has an opacity greater than 5% as determined by reference test method 9D. M.C.L. § 324.5524(2) of the Michigan SIP and Condition B-1.II.B of the Great Lakes Works Title V Permit. The slag pit at the Great Lakes Works Facility is a storage pile within the meaning of these requirements.

146. On approximately 90 occasions, between 2006 and 2008, EPA observed or Defendant reported visible emissions from the slag pits at the Great Lakes Works Facility, including but not limited to Slag Pits B2 and D2, that exceeded the limit listed in the preceding paragraph and ranged up to 12%. These opacity exceedances are each a separate violation of M.C.L. § 324.5524(2) of the Michigan SIP and Great Lakes Works Title V Permit Condition B-1.II.B.

147. Visible emissions from the Basic Oxygen Vessel shall not exceed 20% opacity on a six-minute average. R 336.1301 of the Michigan SIP; Condition A-1.2 of the Great Lakes Works Title V Permit.

148. On at least four occasions between August 15, 2007 and May 10, 2008, Defendant identified continuous opacity monitor readings of greater than 20% opacity on a six-minute average from Great Lakes Works Facility's Basic Oxygen Vessel Electrostatic Precipitator ("ESP"). Each of these exceedances is a violation of R 336.1301 of the Michigan SIP and the Great Lakes Works Title V Permit Condition A-1.2.

149. The Great Lakes Title V Permit and R 336.1301 of the Michigan SIP provide that a person shall not cause or permit to be discharged into the outer air from a process or process equipment a visible emission of a density greater than the most stringent of (a) a 6-minute average of 20% opacity, except for one 6-minute average per hour of not more than 27%

opacity or (b) a limit specified as a condition of a permit to install or permit to operate. R 336.1301 of the Michigan SIP, Title V Permit Condition A-1.2. This opacity limit applies to visible emissions from the Great Lakes Works Facility's blast furnace vent openings, also known as relief valve openings or bleeder stacks openings.

150. On January 25, 2010, in response to EPA's November 2, 2009 Information Request, Defendant reported visible emission readings of blast furnace vent openings at the Great Lakes Works' Facility during the latter part of 2009 and the early part of 2010. Specifically, Defendant reported 19 instances in which visible emissions from the Great Lakes Works Facility's blast furnace relief valves, including but not limited to valves B2 and D2, exceeded the applicable limits of the Michigan SIP and the Great Lakes Works Title V Permit, ranging up to 86.25%.

151. The opacity exceedances identified in the preceding paragraph are each a separate violation of R 336.1301 of the Michigan SIP and Condition A-1.2 of the Great Lakes Works Title V Permit. Because these opacity exceedances indicate a failure to use good air pollution control practices for minimizing emissions, these exceedances are also violations of 40 C.F.R. § 63.7800(a).

152. The Great Lakes Works Title V Permit incorporates Section 5524 of NREPA, approved by EPA as part of the federally enforceable SIP, which requires that any fugitive dust source other than a road, lot or storage pile must not emit opacity of greater than 20% on a three-minute average. M.C.L. § 324.5524(2) of the Michigan SIP and Condition B-1.II.B-of the Great Lakes Works Title V Permit. This opacity limit applies to visible emissions from beached iron at the Great Lakes Works Facility.

153. On at least 19 instances in late 2009, Defendant placed iron to the ground, or beached iron, at the Great Lakes Works Facility, and reported visible emission readings of the beaching metal that exceeded the applicable limit in the Michigan SIP and the Great Lakes Works Title V Permit described in the preceding paragraph.

154. The opacity exceedances identified in the preceding paragraph are each a separate violation of M.C.L. § 324.5524(2) of the Michigan SIP and Condition B-1.II.B of the Great Lakes Works Title V Permit.

155. Unless restrained by an Order of the Court, these violations of the Act and the implementing regulations, the Michigan SIP and the Title V Permit Conditions are likely to continue.

156. As provided in Section 113(b) of the Act, 42 U.S.C. § 7413(b), and Section 167 of the Act, 42 U.S.C. § 7477, and pursuant to the Federal Civil Penalties Inflation Adjustment Act of 1990, 28 U.S.C. § 3701, and 40 C.F.R. § 19.4, the violations set forth above subject Defendant to injunctive relief and civil penalties of up to $25,000 per day for each violation occurring on or before January 30, 1997; up to $27,500 per day for each such violation occurring on or after January 31, 1997 and up to and including March 15, 2004; up to $32,500 per day for each such violation occurring on or after March 16, 2004 and up to and including January 12, 2009; and up to $37,500 per day for each such violation occurring after January 12, 2009.

157. As provided in Section 5530 of Part 55 of NREPA, M.C.L. § 324.5530, the violations set forth above subject Defendant to injunctive relief and a civil fine of not more than $10,000 for each instance of violation and for each day of continued violation.

**FIFTH CLAIM FOR RELIEF: Great Lakes Works Operational Violations**

(Integrated Iron and Steel NESHAP, 40 C.F.R. Part 63, Subpart FFFFF; Title V Permit Conditions)

158. Paragraphs 1 through 79 are realleged and incorporated herein by reference.

159. The owner and operator of an affected source must operate all associated air pollution control equipment and monitoring equipment in a manner consistent with safety and good air pollution control practices for minimizing emissions. 40 C.F.R. § 63.6(e).

160. The owner or operator of an integrated iron and steel manufacturing facility must make monthly inspections of applicable capture systems and initiate corrective action and record all information needed to document conformance with the requirements. 40 C.F.R. § 63.7834(a)(1).

161. The owner or operator of an integrated iron and steel manufacturing facility must prepare and operate at all times according to a written O&M plan for each capture system and control device subject to an operating limit in 40 C.F.R. § 63.7790(b). Each O&M plan must include operating limits for each capture system applied to emissions from a sinter plant discharge end or blast furnace casthouse, or to secondary emissions from a BOP Shop. For each such operating limit parameter, the owner or operator must set a parameter at which the capture system operates during the process operation. 40 C.F.R. § 63.7800(b)(3)(ii); *see also* Great Lakes Works Title V Permit Condition F-01.07.VI.4.

162. The Great Lakes Title V Permit provides that Defendant must not operate any blast furnace unless the baghouse control system is installed, maintained and operated in a satisfactory manner. Great Lakes Works Title V Permit Conditions E-01.12-14.V.1. Accordingly, Defendant must operate the blast furnace casthouse control system, including runner cover controls at tap holes and iron dams, at all times the casthouse is in operation.

163. The Great Lakes Title V Permit provides that Defendant must keep weekly records of corrective actions initiated upon observation of visible emissions, and perform weekly non-certified visible emission observations at the baghouse stack and roof monitors. Great Lakes Works Title V Permit Conditions E-01.12-14.III.2.1-4 and E-01.12-14.III.3.1-2.

164. The Great Lakes Works Title V Permit provides that Defendant must at all times comply with the operation and maintenance requirements specified in 40 C.F.R. Part 63 Subpart FFFFF. Great Lakes Works Title V Permit Condition F-01.07.VI.4.

165. On August 26, 2008, during an EPA inspection of the Great Lakes Works Facility, EPA personnel observed several Blast Furnace casthouse runner covers not in place and without active work in progress (*i.e.*, while the casthouse was in operation and no maintenance work was being performed) and particulate exiting the casthouse roof monitor. Failure to maintain runner covers and operate the baghouse control system in a satisfactory manner at all times during blast furnace operation is a violation of Great Lakes Works Title V Permit Condition E-01.12-14.V.1 and 40 C.F.R. § 63.6(e).

166. During 2007, Defendant failed to demonstrate continuous compliance with the operation and maintenance requirements specified in 40 C.F.R. § 63.7834 and generally in 40 C.F.R. Part 63 Subpart FFFFF for the Great Lakes Works Facility's BOP Shop. This failure to demonstrate continuous compliance with the federal operation and maintenance requirements is a violation of the above-referenced provisions as well as Great Lakes Works Title V Permit Condition F-01.07.III.A.2.6.

167. During 2007, Defendant failed to maintain records in accordance with the Great Lakes Works' O&M Plan as specified in 40 C.F.R. § 63.7842(d) and generally in 40 C.F.R. Part 63 Subpart FFFFF at the Great Lakes Works Facility's BOP Shop. This failure to

maintain records in accordance with the O&M Plan is a violation of the above-referenced provisions as well as Great Lakes Works Title V Permit Condition F-01.07.III.A.3.3.

168.  During 2007, Defendant failed to comply with the operation and maintenance requirements as specified in 40 C.F.R. § 63.7800(a) and (b) and generally in 40 C.F.R. Part 63 Subpart FFFFF at the Great Lakes Works Facility's BOP Shop.  This failure to comply with the O&M requirements is a violation of the above-referenced provisions as well as Great Lakes Works Title V Permit Condition F-01.07.VI.4.

169.  Between January 1 and June 30, 2007, Defendant failed to record and keep on file dates of inspections of the Flux System performed in accordance with Appendix A of Wayne County Consent Order No. 96-10 (CO No. 96-10, Section 5d, Paragraph 2).  This failure to record and keep on file dates of inspections of the Flux System in accordance with Appendix A of Wayne County Consent Order No. 96-10 is a violation of Great Lakes Works Title V Permit Condition E-01.20.III.A.2.

170.  Between January 1 and June 30, 2007, Defendant failed to implement and maintain Standard Maintenance Procedures ("SMPs") for the specified components of the Flux System in accordance with Appendix B of Wayne County Consent Order No. 96-10 (CO No. 96-10, Section 5d, Paragraph 3).  This failure to implement and maintain SMPs for the specified components of the Flux System is a violation of Great Lakes Works Title V Permit Condition E01.20.V.2.

171.  During the weeks of April 29, May 6 and May 13, 2007, Defendant did not conduct the required non-certified observation for the cast house roof monitor and certified observation for the casthouse roof monitor of the D Blast Furnace Casthouse Operations.  This failure to conduct the required non-certified and certified observations for the casthouse roof

monitor of the D Blast Furnace Casthouse is a violation of Great Lakes Works Title V Permit Condition E-01.14.III.3.2.

172.    During January through June 2007, Defendant failed to demonstrate continuous compliance with the operation and maintenance requirements specified in 40 C.F.R. § 63.7834 and generally in 40 C.F.R. Part 63 Subpart FFFFF at the Great Lakes Works Facility's A, B and D Blast Furnaces.  This failure to demonstrate continuous compliance with the federal operation and maintenance requirements is a violation of the above-referenced provisions and Great Lakes Works Title V Permit Condition F-01.05.III.A.2.7.

173.    During 2007, Defendant failed to maintain records in accordance with the Great Lakes Works O&M Plan as specified in 40 C.F.R. § 63.7842(d) and generally in 40 C.F.R. Part 63 Subpart FFFFF at the Great Lakes Works' A, B, and D Blast Furnaces.  This failure to maintain records in accordance with the O&M Plan is a violation of the above-referenced provisions and Great Lakes Works Title V Permit Condition F-01.05.III.A.3.

174.    During 2007, Defendant failed to comply with the operation and maintenance requirements as specified in 40 C.F.R. § 63.7800(a) and (b) and generally in 40 C.F.R. Part 63 Subpart FFFFF at the Great Lakes Works' A, B and D Blast Furnaces.  This failure to comply with the O&M requirements is a violation of the above-referenced provisions and Great Lakes Works Title V Permit Condition F-01.05.VI.5.

175.    Between July and December, 2007, Defendant did not obtain a second visual emissions observation ("VEO") for EGBHZ12-5-Boiler at Boilerhouse Nos. 1 and 2 (two VEOs are required in one year; Defendant performed the first one but not the second one).  The failure to obtain a second VEO for EGBHZ12-5 Boiler at Boilerhouse Nos. 1 and 2 is a violation of Great Lakes Works Title V Permit Condition F-01.02.III.B.3.

176.   During the EPA inspection of the Great Lakes Works facility on December 6, 2007, EPA personnel observed that the hydrogen peroxide chemical feed pump at the Slag Pits and the B Furnace was not working. The failure to ensure that the hydrogen peroxide chemical feed pump at the Slag Pits and the B Furnace was working is a violation of Great Lakes Works Title V Permit Condition F-01.06.V.

177.   In August and October, 2007, Defendant failed to conduct inspections of the No. 3 ESP Induced Draft Fan in the BOP Shop and the No. 1 ESP Induced Draft Fan in the BOP Shop, respectively, in accordance with the requirements of 40 C.F.R. § 63.7830(b) and generally of 40 C.F.R. Part 63 Subpart FFFFF. This failure to conduct inspections in accordance with the NESHAP requirements is a violation of the above-referenced provisions and Great Lakes Works Title V Permit Condition F-01.07.VI.4.

178.   In August and October, 2007, Defendant failed to demonstrate continuous compliance with the O&M requirements of the No. 3 ESP Induced Draft Fan in the BOP Shop and the No. 1 ESP Induced Draft Fan in the BOP Shop, respectively, in accordance with the requirements of 40 C.F.R. § 63.7834 and generally of 40 C.F.R. Part 63 Subpart FFFFF. This failure to demonstrate continuous compliance with the operation and maintenance requirements is a violation of the above-referenced provisions and Great Lakes Works Title V Permit Condition F-01.07.III.A.2.6.

179.   In August and October, 2007, Defendant failed to maintain records of the No. 3 ESP Induced Draft Fan in the BOP Shop and the No. 1 ESP ID Fan in the BOP Shop, respectively, in accordance with the Great Lakes Works' O&M Plan, the requirements of 40 C.F.R. § 63.7842(d), and generally of 40 C.F.R. Part 63 Subpart FFFFF. This failure to

maintain such records is a violation of the above-referenced provisions and Great Lakes Works Title V Permit Condition F-01.07.VI.4.

180.    On November 5, 2007, Defendant operated the Great Lakes Works' ESP dust silo at the BOP Shop while the telescoping chute or other equivalent means to the bottom of the ESP dust silo was not operating properly. This failure to operate the dust silo at the BOP Shop while the telescoping chute or other equivalent means to the bottom of the ESP dust silo was not operating properly is a violation of Great Lakes Works Title V Permit Condition E-01.18.VI.3.

181.    Defendant's O&M Plan for 2007 for the Great Lakes Works facility does not contain required operating parameter limits, including damper position parameters, at which the BOP Shop capture systems must operate continuously. Failure to set damper position parameters in the O&M Plan is a violation of 40 C.F.R. § 63.7800(b)(3)(ii) and Great Lakes Works Title V Permit Condition F-01.07.VI.4.

182.    During EPA's inspection of the Great Lakes Works facility on August 25 and 26, 2008, EPA personnel observed emissions from a leaking bell on the B2 Blast Furnace, caused by improper sealing or other malfunction associated with the bell system. U.S. Steel failed to cease production or otherwise take action to return the furnace to its normal operating condition in order to minimize emissions. Failure to actively mitigate emissions caused by known malfunctions is a violation of 40 C.F.R. § 63.6(e)(1) and Great Lakes Works Title V Permit Condition F-01.05.VI.5.

183.    Unless restrained by an Order of the Court, these violations of the Act, the implementing regulations and the Title V Permit Conditions are likely to continue.

184.   As provided in Section 113(b) of the Act, 42 U.S.C. § 7413(b), and Section 167 of the Act, 42 U.S.C. § 7477, and pursuant to the Federal Civil Penalties Inflation Adjustment Act of 1990, 28 U.S.C. § 3701, and 40 C.F.R. § 19.4, the violations set forth above subject Defendant to injunctive relief and civil penalties of up to $25,000 per day for each violation occurring on or before January 30, 1997; up to $27,500 per day for each such violation occurring on or after January 31, 1997 and up to and including March 15, 2004; up to $32,500 per day for each such violation occurring on or after March 16, 2004 and up to and including January 12, 2009; and up to $37,500 per day for each such violation occurring after January 12, 2009.

185.  As provided in Section 5530 of Part 55 of NREPA, M.C.L. § 324.5530, the violations set forth above subject Defendant to injunctive relief and a civil fine of not more than $10,000 for each instance of violation and for each day of continued violation.

### SIXTH CLAIM FOR RELIEF: Granite City Works - Opacity Violations

(Integrated Iron and Steel NESHAP, 40 C.F.R. Part 63, Subpart FFFFF)

186.  Paragraphs 1 through 79 are realleged and incorporated herein by reference.

187.  Visible emissions from blast furnace casthouses in a facility must not exceed 20% opacity on a six-minute average.  Table I(7) of the Integrated Iron and Steel NESHAP, 40 C.F.R. § 63.7790(a).

188.  On at least seven occasions between April 2, 2007 and June 17, 2008, Defendant identified visible emissions of greater than 20% from its Granite City blast furnace casthouse roof monitor.  Each of those exceedances is a separate violation of 40 C.F.R. § 63.7790(a).

189.  Visible emissions from the BOP Shop roof monitor must not exceed 20% opacity on a three-minute average.  40 C.F.R. § 63.7790(a).  On more than 50 occasions between

August 11, 2006 and October 1, 2008, Defendant identified visible emissions of greater than 20% from the Granite City Works' BOP Shop roof monitor. Each of those exceedances is a separate violation of 40 C.F.R. § 63.7790(a).

190. Unless restrained by an Order of the Court, these violations of the Act and the implementing regulations are likely to continue.

191. As provided in Section 113(b) of the Act, 42 U.S.C. § 7413(b), and Section 167 of the Act, 42 U.S.C. § 7477, and pursuant to the Federal Civil Penalties Inflation Adjustment Act of 1990, 28 U.S.C. § 3701, and 40 C.F.R. § 19.4, the violations set forth above subject Defendant to injunctive relief and civil penalties of up to $25,000 per day for each violation occurring on or before January 30, 1997; up to $27,500 per day for each such violation occurring on or after January 31, 1997 and up to and including March 15, 2004; up to $32,500 per day for each such violation occurring on or after March 16, 2004 and up to and including January 12, 2009; and up to $37,500 per day for each such violation occurring after January 12, 2009.

### SEVENTH CLAIM FOR RELIEF:  Granite City - Operational Violations

(Integrated Iron and Steel NESHAP, 40 C.F.R. Part 63, Subpart FFFFF)

192. Paragraphs 1 through 79 are realleged and incorporated herein by reference.

193. The owner or operator of an integrated iron and steel manufacturing facility must make monthly inspections of applicable capture systems and initiate corrective action and record all information needed to document conformance with the Integrated Iron and Steel NESHAP requirements.  40 C.F.R. § 63.7834(a)(1).

194. During 2006 through 2008, U.S. Steel Reports identified five six-month periods in which Defendant failed to conduct inspections related to capture systems at its Granite City

Works Facility for some or all of the following equipment and processes: Iron Spout Baghouse – daily operational and quarterly physical integrity inspections; Casthouse Baghouse – daily operational and quarterly physical integrity inspections; Reladle/Desulfurization Baghouse – monthly bag tension and quarterly physical integrity inspections; Slag Skimmer Baghouse – monthly cleaning mechanisms and quarterly physical integrity inspections; Ladle Metallurgy Furnace Baghouse – monthly cleaning mechanism and quarterly physical integrity inspections. These failures to conduct inspections are violations of 40 C.F.R. § 63.7834(a)(1) and 63.7830(b)(4).

195.    The owner or operator of an integrated iron and steel manufacturing facility must operate at all times in accordance with a written O&M Plan that, in part, indicates the level of the ventilation draft and the damper position settings for the capture system or control device. 40 C.F.R. § 63.7834(a)(1).

196.    From 2006 through 2008, U.S. Steel Reports identified five six-month periods in which Defendant failed to comply with the fan amp and damper position requirements of Defendant's O&M Plan for its Iron Spout Baghouse and Casthouse Baghouses Nos. 1 and 2 at its Granite City Works Facility. These failures to comply with the O&M Plan are violations of 40 C.F.R. § 63.7834(a)(1).

197.    Unless restrained by an Order of the Court, these violations of the Act and the implementing regulations are likely to continue.

198.    As provided in Section 113(b) of the Act, 42 U.S.C. § 7413(b), and Section 167 of the Act, 42 U.S.C. § 7477, and pursuant to the Federal Civil Penalties Inflation Adjustment Act of 1990, 28 U.S.C. § 3701, and 40 C.F.R. § 19.4, the violations set forth above subject Defendant to injunctive relief and civil penalties of up to $25,000 per day for each violation

occurring on or before January 30, 1997; up to $27,500 per day for each such violation

occurring on or after January 31, 1997 and up to and including March 15, 2004; up to $32,500

per day for each such violation occurring on or after March 16, 2004 and up to and including

January 12, 2009; and up to $37,500 per day for each such violation occurring after January 12,

2009.

### EIGHTH CLAIM FOR RELIEF: Illinois State-Only Claim – Integrated Iron and Steel NESHAP Recordkeeping Violations

(Integrated Iron and Steel NESHAP, 40 C.F.R. Part 63, Subpart FFFFF; 63.7833(c)(3); 415 ILCS 5/9.1(d)(1))

199.  Paragraphs 1 through 79 are realleged and incorporated herein by reference.

200.  The owner or operator of an integrated iron and steel manufacturing facility must

maintain records that document conformance with the requirements for conducting the quarterly

inspections (40 C.F.R. § 63.7830(b)(4)) for physical integrity ("Quarterly Inspections"). 40 C.F.R. §

63.7833(c)(3).

201.  On August 25, September 8, and September 19, 2008, IEPA conducted an inspection of

recordkeeping associated with the Quarterly Inspections of the Iron Spout Baghouse, Casthouse

Baghouse, Reladling/Desulf Baghouse, Slag Skimmer Baghouse, and Ladle Metallurgy Furnace

Baghouse. During the IEPA inspections, no Quarterly Inspection records existed for any of the

baghouses for the first six months of 2008. These failures to record Quarterly Inspections of the

baghouses are violations of 40 C.F.R. § 63.7833(c)(3) and 415 ILCS 5/9.1(d)(1).

202.  Unless restrained by an Order of the Court, these violations of the Illinois Environmental

Protection Act are likely to continue.

203.  As provided in Sections 42(a) and (e) of the Illinois Environmental Protection Act, 415

ILCS 5/42(a) and (e), the violations set forth above subject Defendant to injunctive relief and civil

penalties of up to $50,000 for each violation and up to an additional $10,000 for each day that the violation has continued.

## NINTH CLAIM FOR RELIEF: Illinois State-Only Claim - Failure to Maintain Quench Tower Baffles

(Coke Ovens NESHAP, 40 C.F.R. Part 63, Subpart CCCCC; Operating Permit 80070016; 415 ILCS 5/9(b) and 9.1(d)(1))

204. Paragraphs 1 through 79 are realleged and incorporated herein by reference.

205. The owner or operator of a coke oven battery at a coke plant must inspect each quench tower monthly for damaged or missing baffles and blockage. 40 C.F.R. § 63.7295(b)(3).

206. The owner or operator of a coke oven battery at a coke plant must initiate repair or replacement of damaged or missing baffles within 30 days and complete as soon as practicable. 40 C.F.R. § 63.7295(b)(4).

207. State Operating Permit No. 80070016, Condition 4, provides that Defendant must maintain coke oven quench tower baffles.

208. The owner or operator of a coke oven battery at a coke plant must wash the baffles in each quench tower once each day that the tower is used to quench coke. 40 C.F.R. § 63.7295(b)(2).

209. As stated above, Defendant is required to certify and submit U.S. Steel Reports in accordance with 40 C.F.R. Part 63, Subpart CCCCC, identifying any deviations from the requirements of the Coke Ovens NESHAP and the corrective action taken. 40 C.F.R. § 63.7341(c)(7)(ii). Defendant submitted such reports to IEPA.

210. U.S. Steel Reports submitted July 31, 2008 identified that the Defendant failed to perform two monthly inspections of the baffles on the quench tower during the semi-annual

period from January 1, 2008 through June 30, 2008. The failure to inspect is a violation of 40 C.F.R. § 63.7295(b)(3) and 415 ILCS 5/9.1(d)(1).

211. On August 28, 2008, IEPA conducted an inspection of the coke oven area at Defendant's facility. On that day, several quench tower baffles on the third and fourth sections from the west were in deteriorated condition. In addition, IEPA reviewed Defendant's "Monthly Quenching Station-Mechanic" form for May 2008 which indicated that baffles needed replacing. Failure to initiate repair or replacement of damaged or missing baffles within 30 days of being identified is a violation of 40 C.F.R. § 63.7295(b)(4) and 415 ILCS 5/9.1(d)(1). Failure to maintain the baffles is a violation of Operating Permit 80070016, Condition 4, and 415 ILCS 5/9(b).

212. The U.S. Steel Reports submitted July 31, 2008 failed to identify what corrective action was taken, if any, to repair or replace damaged or missing baffles. Failure to identify such corrective action in U.S. Steel Reports is a violation of 40 C.F.R. § 63.7341(c)(7)(ii) and 415 ILCS 5/9.1(d)(1).

213. On August 28, 2008, IEPA observed the spaces between the baffles in the middle portion and eastern portion of the quench tower. These spaces were plugged up with coke particles indicating the baffles had not been adequately washed. Failure to wash the baffles in the quench tower is a violation of 40 C.F.R. § 63.7295(b)(2) and 415 ILCS 5/9.1(d)(1).

214. Unless restrained by an Order of the Court, these violations of Operating Permit 80070016 and the Illinois Environmental Protection Act are likely to continue.

215. As provided in Sections 42(a) and (e) of the Illinois Environmental Protection Act, 415 ILCS 5/42(a) and (e), the violations set forth above subject Defendant to injunctive relief and civil penalties of up to $50,000 for each violation and up to an additional $10,000 for

each day that the violation has continued.

## TENTH CLAIM FOR RELIEF: Illinois State-Only Claim - Violations of Benzene Emissions from Coke By-Product Recovery Plants

(NESHAP, 40 C.F.R. Part 61, Subpart L; CAAPP Permit No. 96030056, and 415 ILCS 5/9.1(d)(1))

216. Paragraphs 1 through 79 are realleged and incorporated herein by reference.

217. NESHAP for Benzene Emissions from Coke-By-Product Recovery Plants applies to owners and/or operators of furnace and foundry coke by-product recovery plants and the equipment intended to operate benzene services. 40 C.F.R. § 61.130(a).

218. The owner or operator of a furnace or a foundry coke byproduct recovery plant shall duct gases from process vessels, tar storage tanks, and tar-intercepting sumps to a control system which shall be designed and operated for no detectable emissions. 40 C.F.R. § 61.132(a)(2).

219. On September 23, 2008, the IEPA conducted an inspection of the by-product recovery plant at Defendant's facility. On that day, the #2 tar dehydration tank was leaking visible emissions from a pressure relief device to the atmosphere. These visible emissions are a violation of 40 C.F.R. § 61.132(a)(2) and 415 ILCS 5/9.1(d)(1).

220. Equipment found to be leaking at Defendant's facility is marked with a weatherproof tag that shows the identification number of the equipment in accordance with 40 C.F.R. § 61.246(b)(1). In early 2008, the Defendant retagged equipment at the facility, including equipment at the new light oil loading area and equipment in benzene service. During the third calendar quarter of 2011, the Defendant conducted a retagging effort in the light oil recovery area.

221. The U.S. Steel Reports for the first semi-annual period in 2008 and the second semi-annual period in 2011 did not include the information associated with the equipment retagging projects conducted during those periods. Failure to include revisions to any items reported according to 40 C.F.R. § 61.138(e) in a semi-annual compliance report is a violation of 40 C.F.R. § 61.138(f)(6) and 415 ILCS 5/9.1(d)(1).

222. The amended U.S. Steel Report submitted October 31, 2008, for the first semi-annual 2008 report submitted July 2008, attached a copy of the list of equipment for the Retagging Project. The U.S. Steel Report submitted October 31, 2008 failed to provide information detailing the process unit identification, percent by weight of benzene in the fluid, fluid state, and method of compliance for each piece of equipment included in the U.S. Steel Report. Failure to include the process unit identification, percent by weight of benzene in the fluid, fluid state, and method of compliance is a violation of 40 C.F.R. § 61.138(e)(4)(ii) and (iii), and 415 ILCS 5/9.1(d)(1).

223. The owner or operator of a furnace or a foundry coke byproduct recovery plant shall record and maintain for two years following each semi-annual inspection, and other inspections, information pertaining to the presence of a leak, including the date of attempted and actual repair and method of repair of the leak. 40 C.F.R. § 61.138(b)(3).

224. The Defendant maintained records for the semi-annual checks for control system defects pursuant to 40 C.F.R. § 61.138(b)(1)-(2). The actual method of repairs for leaks found during the semi-annual checks conducted on October 29, 2007 and May 16, 19 and 20, 2008, were not documented. Failure to maintain records for the methods of repairs for these leaks is a violation of 40 C.F.R. § 61.138(b)(3) and 415 ILCS 5/9.1(d)(1).

225.  Owners or operators of a furnace or a foundry coke byproduct recovery plant are required to monitor connections and seals on control systems for process vessels, tar storage tanks, and tar intercepting pumps on a semiannual basis to determine if it is operating with no detectable emissions and conduct repairs where leaks are detected.  40 C.F.R. § 61.132(b).

226.  Owners or operators of a light-oil sump are required to monitor the connections and seals on control systems on a semiannual basis to determine if it is operating with no detectable emissions and conduct repairs where leaks are detected.  40 C.F.R. § 61.133(c).

227.  Owners or operators of equipment in benzene service are required to monitor each exhauster on a quarterly basis for leaks and conduct repairs when a leak is detected.  40 C.F.R. § 61.135(a) and (d), and CAAPP Permit 96030056, Conditions 7.3.9(b) and 7.3.6(a)(v).

228.  Owners or operators of process vessels, tar storage tanks, and tar-intercepting sumps shall design and operate the control systems for no detectable emissions and shall monitor the connections and seal on each control system for leaks.  CAAPP Permit 96030056, Condition 7.3.6(a)(iii)(B) and 7.3.6(a)(iv)(C).

229.  Leak detection monitoring shall comply with Method 21 of Appendix A of 40 C.F.R. Part 60.  40 C.F.R. § 61.245(b)(3).  Calibration gases for leak detection instruments shall be zero gas and a mixture of methane or n-hexane and air at a concentration of approximately, but less than, 10,000 ppm methane or n-hexane.  40 C.F.R. § 61.245(b)(4)(i) and (ii).

230.  On September 28, 2011, IEPA conducted an inspection of the byproduct recovery plant associated with the coke oven batteries.  A review of the leak detection and repair program indicated that the leak detection instrument is not calibrated daily and that the calibration gas utilized was 100 parts per million isobutylene.

231. Failure to calibrate the leak detection instrument each day of use and therefore failure to comply with leak detection monitoring requirements is a violation of 40 C.F.R. §§ 61.132(b), 61.133(c), 61.135(a) and (d), and 61.245(b)(3); CAAPP Permit 96030056, Conditions 7.3.6(a)(iii)(B), 7.3.6(a)(iv)(C), 7.3.6(a)(v) and 7.3.9(b); and 415 ILCS 5/9.1(d)(1) and 39.5(6).

232. Failure to utilize calibration gases that included a zero gas and either methane or n-hexane at a concentration of approximately 10000 parts per million is a violation of 40 C.F.R. §§ 61.133(c), 61.135(a) and (d), 61.245(b)(4)(i) and (ii); CAAPP Permit 96030056, Conditions 7.3.6(a)(iii)(B), 7.3.6(a)(iv)(C), 7.3.6(a)(v) and 7.3.9(b); and 415 ILCS 5/9.1(d)(1) and 39.5(6).

233. Owners and/or operators of process vessels, storage tanks, tar sump, and light oil sumps are required to comply with the leak detection and repair recordkeeping requirements, which include identifying the date of the inspection and the name of the inspector. 40 C.F.R. § 61.138(b)(1) and Condition 7.3.10(a)(ii)(A).

234. Owners and/or operators of a equipment in benzene service are required to comply with the leak detection and repair recordkeeping requirements of 40 C.F.R. § 61.246, including identifying the instrument and operator identification numbers and the equipment identification number for each leak detected. 40 C.F.R. § 61.138(c) and Condition 7.3.10(c)(iii)(A).

235. During the September 28, 2011 inspection by IEPA, a review of the leak detection and repair program recordkeeping was conducted. The recordkeeping indicated that recordkeeping forms for Method 21 monitoring did not show the identification of the instrument and the operator. Failure to include an identification of the leak detection

instrument and operator is a violation of 40 C.F.R. § 61.138(b)(1) and 61.138(c); CAAPP

Permit 96030056, Conditions 7.3.10(a)(ii)(A) and 7.3.10(c)(iii)(A); and 415 ILCS 5/9.1(d)(1)

and 39.5(6).

    236.  Owners and/or operators of a equipment in benzene service are required to

comply with the leak detection and repair recordkeeping requirements of 40 C.F.R.§ 61.246,

including recording explanations for why valves or pumps are unsafe or difficult to monitor.

40 C.F.R. § 61.138(c) and CAAPP Permit 96030056, Condition 7.3.10(c)(v)(A) and (B).

    237.  On September 28, 2011, IEPA conducted an inspection of the byproduct recovery

plant associated with the coke oven batteries.  A review of the records for the third quarter

monitoring event for valves indicated that no written explanation was provided for the valves

designated as difficult or unsafe.  Failing to record explanations for why valves or pumps are

unsafe or difficult to monitor is a violation of 40 C.F.R. § 61.138(c); CAAPP Permit

96030056, Condition 7.3.10(c)(v)(A) and (B); and 415 ILCS 5/9.1(d)(1) and 39.5(6).

    238.  Unless restrained by an Order of the Court, these violations of the Illinois

Environmental Protection Act are likely to continue.

    239.  As provided in Sections 42(a) and (e) of the Illinois Environmental Protection

Act, 415 ILCS 5/42(a) and (e), the violations set forth above subject Defendant to injunctive

relief and civil penalties of up to $50,000 for each violation and up to an additional $10,000 for

each day that the violation has continued.

### ELEVENTH CLAIM FOR RELIEF: Illinois State-Only Claim - Violations of State Operating Permit

(State Operating Permit 95010001; Section 212.309(a) of the Illinois Pollution Control Board's
Air Pollution Regulations, 35 IAC 212.309(a); and Section 9(a) and (b) of the Illinois
Environmental Protection Act, 415 ILCS 5/9(a) and (b))

    240.  Paragraphs 1 through 79 are realleged and incorporated herein by reference.

241. The Defendant's facility is required to operate under the provisions of an operating program designed to significantly reduce fugitive particulate matter emissions. 35 IAC 212.309(a).

242. State Operating Permit 95010001, Condition 27(a) and (b)(ii), provides that paved roadways and areas shall be maintained in good condition and that the Defendant shall sweep or flush paved roadways and other areas. Specifically, Road segments P, V, W, X, Z, D-D, E-E, and CS(1) shall be swept and flushed at least five days per week.

243. On August 13, 2008, IEPA conducted an inspection of the coal handling area of Defendant's facility. On that day, high lift traffic and coal traffic areas were not properly watered to control for fugitive particulate matter. In addition, roadways CS-1 and X were not properly swept, flushed or maintained in a good condition. Failure to not properly water high lift traffic and coal traffic areas is a violation of 35 IAC 212.309(a) and 415 ILCS 5/9(a). Failure to properly sweep and flush paved roadways and maintain them in good condition is a violation of 35 IAC 212.309(a); Operating Permit 95010001, Condition 27(a) and (b)(ii); and 415 ILCS 5/9(a) and (b).

244. Unless restrained by an Order of the Court, these violations of Operating Permit 95010001, the Illinois Environmental Protection Act, and the implementing regulations are likely to continue.

245. As provided in Sections 42(a) and (e) of the Illinois Environmental Protection Act, 415 ILCS 5/42(a) and (e), the violations set forth above subject Defendant to injunctive relief and civil penalties of up to $50,000 for each violation and up to an additional $10,000 for each day that the violation has continued.

**TWELFTH CLAIM FOR RELIEF: Illinois State-Only Claim - Recordkeeping Violations Re Fugitive Particulate Emissions**

(Sections 212.316(g)(2)(C)-(E), and (5) of the Illinois Pollution Control Board's Air Pollution Regulations, 35 IAC 212.316(g)(C)-(E), and (5); and Section 9(a) of the Illinois Environmental Protection Act, 415 ILCS 5/9(a))

246.   Paragraphs 1 through 79 are realleged and incorporated herein by reference.

247.   Defendant is required to maintain written records in accordance with the operating program for control of fugitive particulate matter emissions. 35 IAC 212.316(g)(1).

248.   Defendant's written records must include a map or diagram showing the location of all emission units controlled, including the location, identification, length and width of roadways. 35 IAC 212.316(g)(2)(C).

249.   Defendant's written records must include the following for each application of water or chemical solution to roadways by truck: the name and location of the roadway controlled, application rate of each truck, frequency of each application, width of each application, identification of each truck used, total quantity of water or chemical used for each application and, for each application of chemical solution, the concentration and identity of the chemical. 35 IAC 212.316(g)(2)(D).

250.   Defendant's written records must include the following for application of physical or chemical control agents: the name of the agent, application rate and frequency, and total quantity of agent, and, if diluted, percent of concentration, used each day. 35 IAC 212.316(g)(2)(E).

251.   Defendant must provide the following information in a quarterly report filed in accordance with the operating program for control of fugitive particulate matter emissions: the dates any necessary control measures were not implemented, a listing of those control

measures, the reasons that the control measures were not implemented, and any corrective actions taken. 35 IAC 212.316(g)(5).

252. Defendant maintains a set of maps associated with the operating program for control of fugitive particulate matter emissions pursuant to 35 IAC Subpart K and State Operating Permit 95010001 ("Production Increase Permit.") On September 19, 2008, IEPA received a copy of Defendant's then current set of maps.

253. On September 26, 2008, IEPA conducted an inspection of the coal handling area of Defendant's facility. The inspection concluded that Defendant added an unpaved road to reroute the traffic that previously used paved road D-D. On September 26, 2008, this unpaved road was not on the map for the operating program for control of fugitive particulate matter emissions. Defendant changed roadway CS-2 to include specific exit and reentry segments for trucks bringing in purchased coke towards the eastern end of the ore field. On September 26, 2008, the maps attached to the submitted program were not accurate with respect to the route of roadway CS-2. On September 26, 2008, the maps did not identify the traffic area for the high lift transporting coal from the storage piles to the hoppers at the coal crusher area and did not identify the traffic area for incoming trucks hauling coal to storage piles. Failure to maintain accurate maps is a violation of 35 IAC 212.316(g)(2)(C) and 415 ILCS 5/9(a).

254. On September 26, 2008, IEPA reviewed Defendant's records maintained in accordance with the operating program for control of fugitive particulate matter emissions, including records for treatment of traffic areas. Defendant maintains records identifying which roadway segments are treated each day. However, the recordkeeping form in use at the time of the IEPA inspection did not identify any treatment that is done in addition to the first treatment

each day. Failure to document the frequency of each treatment application to roadways is a violation of 35 IAC 212.316(g)(2)(D) and (E) and 415 ILCS 5/9(a).

255. On November 3, 2008, IEPA received the third calendar quarter report from Defendant required by 35 IAC 212.316(g)(5). The report failed to include information detailing why the flushing or sweeping of roadways CS-1 and X were not performed. Failure to provide reasons that control measures were not implemented is a violation of 35 IAC 212.316(g)(5) and 415 ILCS 5/9(a)

256. Unless restrained by an Order of the Court, these violations of the Illinois Environmental Protection Act and the implementing regulations are likely to continue.

257. As provided in Sections 42(a) and (e) of the Illinois Environmental Protection Act, 415 ILCS 5/42(a) and (e), the violations set forth above subject Defendant to injunctive relief and civil penalties of up to $50,000 for each violation and up to an additional $10,000 for each day that the violation has continued.

## THIRTEENTH CLAIM FOR RELIEF: Illinois State-Only Claim –Battery Work Rules Violations

(State Operating Permit 80050010: Battery A; State Operating Permit 82060043: Battery B; Section 212.443(i) of the Illinois Pollution Control Board's Air Pollution Regulations, 35 IAC 212.443(i); and Sections 9(a) and (b) of the Illinois Environmental Protection Act, 415 ILCS 5/9(a), (b))

258. Paragraphs 1 through 79 are realleged and incorporated herein by reference.

259. Two 45-oven by-product coke oven batteries are operated at the facility. These batteries are referred to as "A" and "B." Battery A began operation in 1980, and Battery B in 1982. Each is rated at 1160 tons of coal charged, per 24-hour day, for coking. The batteries are subject to the requirements of 40 C.F.R. 63, Subpart L and the requirements contained in

35 IAC 212.443. The operation of Battery A is covered under Operating Permit 80050010 and the operation of Battery B is covered under Operating Permit 82060043.

260. Defendant is required to comply with the operating and maintenance work rules for Battery A and Battery B approved by IEPA. 35 IAC 212.443(i); Coke Oven Battery A Operating Permit 80050010, Condition 4; Coke Oven Battery B Operating Permit 82060043, Condition 14; and 415 ILCS 5/9(a) and (b).

261. On January 6, 2009, IEPA received a report from the Defendant, submitted pursuant to the requirements of 40 C.F.R. Part 63, Subpart L. The report indicated that a total of 23 coke ovens were charged off the main on December 24, 2008 due to derailment of the pushing control system. Seven coke ovens were charged off the collecting mains on Battery A. Sixteen coke ovens were charged off the collecting mains on Battery B. Failure to comply with the operating and maintenance work rules for Battery A and Battery B is a violation of 35 IAC 212.443(i); Coke Oven Battery A Operating Permit 80050010, Condition 4; Coke Oven Battery B Operating Permit 82060043, Condition 14; and 415 ILCS 5/9(a) and (b).

262. Unless restrained by an Order of the Court, these violations of Operating Permits 80050010 and 82060043, the Illinois Environmental Protection Act, and the implementing regulations are likely to continue.

263. As provided in Sections 42(a) and (e) of the Illinois Environmental Protection Act, 415 ILCS 5/42(a) and (e), the violations set forth above subject Defendant to injunctive relief and civil penalties of up to $50,000 for each violation and up to an additional $10,000 for each day that the violation has continued.

**FOURTEENTH CLAIM FOR RELIEF: Illinois State-Only Claim - Visible Emission Violations at Battery B**

(Operating Permit 82060043; Section 201.141 of the Illinois Pollution Control Board's Air Pollution Regulations, 35 IAC 201.141; and Sections 9(a) and (b) of the Illinois Environmental Protection Act, 415 ILCS 5/9(a), (b))

264. Paragraphs 1 through 79 are realleged and incorporated herein by reference.

265. Section 201.141 of the Illinois Pollution Control Board's Air Pollution Regulations, 35 IAC 201.141, states that no person shall cause or threaten or allow the discharge or emission of any contaminant into the environment in any State so as, either alone or in combination with contaminants from other sources, to cause or tend to cause air pollution in Illinois, or so as to violate the provisions of those regulations, or so as to prevent the attainment or maintenance of any applicable ambient air quality standard.

266. No more than 5% of the door areas of operating coke ovens on Battery B shall have any visible emissions at any time. Operating Permit 82060043, Condition 5.

267. On September 15, 2008, IEPA conducted an inspection at the facility. On that day, thirteen oven doors (14% of the total of ninety doors) of Battery B had leaks of visible emissions. Causing or allowing visible emissions from more than five percent of the door areas of the operating coke ovens on Battery B is a violation of Operating Permit 82060043, Condition 5; 35 IAC 201.141; and 415 ILCS 5/9(a) and (b).

268. On July 10, 2010, OCS Environmental, Inc. observed visible emissions from 8.14% of the doors on Battery B. Causing or allowing visible emissions from more than five percent of the door areas of the operating coke ovens on Battery B is a violation of Operating Permit 82060043, Condition 5; 35 IAC 201.141; and 415 ILCS 5/9(a) and (b).

269. On July 12, 2010, OCS Environmental, Inc. observed visible emissions from 6.25% of the doors on Battery B. Causing or allowing visible emissions from more than five

percent of the door areas of the operating coke ovens on Battery B is a violation of Operating Permit 82060043, Condition 5; 35 IAC 201.141; and 415 ILCS 5/9((a) and b).

270. On July 17, 2010, OCS Environmental, Inc. observed visible emissions from 9.09% of the doors on Battery B. Causing or allowing visible emissions from more than five percent of the door areas of the operating coke ovens on Battery B is a violation of Operating Permit 82060043, Condition 5; 35 IAC 201.141; and 415 ILCS 5/9(a) and (b).

271. On July 21, 2010, OCS Environmental, Inc. observed visible emissions from 5.56% of the doors on Battery B. Causing or allowing visible emissions from more than five percent of the door areas of the operating coke ovens on Battery B is a violation of Operating Permit 82060043, Condition 5; 35 IAC 201.141; and 415 ILCS 5/9(a) and (b).

272. On July 22, 2010, OCS Environmental, Inc. observed visible emissions from 7.77% of the doors on Battery B. Causing or allowing visible emissions from more than five percent of the door areas of the operating coke ovens on Battery B is a violation of Operating Permit 82060043, Condition 5; 35 IAC 201.141; and 415 ILCS 5/9(a) and (b).

273. On July 23, 2010, OCS Environmental, Inc. observed visible emissions from 6.67% of the doors on Battery B. Causing or allowing visible emissions from more than five percent of the door areas of the operating coke ovens on Battery B is a violation of Operating Permit 82060043, Condition 5; 35 IAC 201.141; and 415 ILCS 5/9(a) and (b).

274. On July 28, 2010, OCS Environmental, Inc. observed visible emissions from 6.82% of the door on Battery B. Causing or allowing visible emissions from more than five percent of the door areas of the operating coke ovens on Battery B is a violation of Operating Permit 82060043, Condition 5; 35 IAC 201.141; and 415 ILCS 5/9(a) and (b).

275.  Unless restrained by an Order of the Court, these violations of Operating Permit 82060043, the Illinois Environmental Protection Act, and the implementing regulations are likely to continue.

276.  As provided in Sections 42(a) and (e) of the Illinois Environmental Protection Act, 415 ILCS 5/42(a) and (e), the violations set forth above subject Defendant to injunctive relief and civil penalties of up to $50,000 for each violation and up to an additional $10,000 for each day that the violation has continued.

## FIFTEENTH CLAIM FOR RELIEF: Illinois State-Only Claim - Visible Emission Violations at Battery A

(Operating Permit 80050010; Sections 201.141 and 212.443(d)(1) of the Illinois Pollution Control Board's Air Pollution Regulations, 35 IAC 201.141 and 212.443(d)(1); and Sections 9(a) and (b) of the Illinois Environmental Protection Act, 415 ILCS 5/9(a), (b))

277.  Paragraphs 1 through 79 are realleged and incorporated herein by reference.

278.  No person shall cause or allow visible emissions from more than 10 percent of all coke oven doors at any time.  Compliance shall be determined by a one pass observation of all coke oven doors on any one battery.  35 IAC 212.443(d)(1) and Operating Permit 80050010, Condition 7.

279.  On July 15, 2010, OCS Environmental, Inc. observed 13.41% visible emission door leaks on Battery A. Causing or allowing visible emissions from more than ten (10) percent of all coke oven doors at any time on Battery A is a violation of Operating Permit 80050010, Condition 7; 35 IAC 201.141 and 212.443(d)(1); and 415 ILCS 5/9(a) and (b).

280.  Unless restrained by an Order of the Court, these violations of Operating Permit 80050010, the Illinois Environmental Protection Act, and the implementing regulations are likely to continue.

281. As provided in Sections 42(a) and (e) of the Illinois Environmental Protection Act, 415 ILCS 5/42(a) and (e), the violations set forth above subject Defendant to injunctive relief and civil penalties of up to $50,000 for each violation and up to an additional $10,000 for each day that the violation has continued.

## SIXTEENTH CLAIM FOR RELIEF: Illinois State-Only Claim - Pushing Control System PM Emissions Violations

(Operating Permit 88070071; Sections 201.141 and 212.443(c)(2)(A) of the Illinois Pollution Control Board's Air Pollution Regulations, 35 IAC 201.141 and 212.443(c)(2)(A); 40 C.F.R. § 63.7290(a)(4); and Sections 9(a) and (b) of the Illinois Environmental Protection Act, 415 ILCS 5/9(a), (b))

282. Paragraphs 1 through 79 are realleged and incorporated herein by reference.

283. The gas cleaning device for the pushing control systems shall be maintained and operated to meet 0.04 pounds of particulate matter per ton of coke pushed during the pushing operation. Operating Permit 88070071, Condition 2; 35 IAC 212.443(c)(2)(A); and 40 C.F.R. § 63.7290(a)(4).

284. On March 9-11, 2010, ARI Environmental, Inc. conducted a periodic stack test on Coke Side Emission Control Gas Cleaning EQC Car #3 ("Pushing Control System #3"). The average emission rate for Pushing Control System #3 was measured at 0.070 lb/ton. Failure to operate Pushing Control System #3 to meet the 0.04 pounds of particulate matter per ton of coke pushed limitation is a violation of Operating Permit 88070071, Condition 2; 35 IAC 201.141 and 212.443(c)(2)(A); 40 C.F.R. § 63.7290(a)(4); and 415 ILCS 5/9(a) and (b).

285. Unless restrained by an Order of the Court, these violations of Operating Permit 88070071, the Illinois Environmental Protection Act, and the implementing regulations are likely to continue.

286. As provided in Sections 42(a) and (e) of the Illinois Environmental Protection Act, 415 ILCS 5/42(a) and (e), the violations set forth above subject Defendant to injunctive relief and civil penalties of up to $50,000 for each violation and up to an additional $10,000 for each day that the violation has continued.

## SEVENTEENTH CLAIM FOR RELIEF: Illinois State-Only Claim-- Failure to Collect and Duct Particulate Matter Emissions

(Section 212.446(b)(1) of the Illinois Pollution Control Board's Air Pollution Regulations, 35 IAC 212.446(b)(1); and 415 ILCS 5/9(a))

287. Paragraphs 1 through 79 are realleged and incorporated herein by reference.

288. Particulate matter emissions from hot metal transfers to a mixer or ladle, hot metal desulfurization operations and ladle lancing shall be collected and ducted to pollution control equipment, and emissions from the pollution control equipment shall not exceed 69 mg/dscm (0.03 gr/dscf). 35 IAC 212.446(b)(1).

289. U.S. Steel operates a reladling station at the BOP Shop. U.S. Steel submits a quarterly report of upset conditions for the major operating areas at the steel mill including the reladling station. U.S. Steel's quarterly report submitted on July 30, 2008 showed that U.S. Steel failed to collect and duct emissions from reladling of molten iron on numerous occasions during the second calendar quarter of 2008. Specifically, U.S. Steel operated the emergency reladling station during scheduled maintenance on the BOP Shop building. Failure to collect and duct particulate matter emissions from the reladling station to pollution control equipment is a violation of 35 IAC 212.446(b)(1) and 415 ILCS 5/9(a).

290. Unless restrained by an Order of the Court, these violations of the Illinois Environmental Protection Act and the implementing regulations are likely to continue.

291. As provided in Sections 42(a) and (e) of the Illinois Environmental Protection Act, 415 ILCS 5/42(a) and (e), the violations set forth above subject Defendant to injunctive relief and civil penalties of up to $50,000 for each violation and up to an additional $10,000 for each day that the violation has continued.

## EIGHTEENTH CLAIM FOR RELIEF:  Illinois State-Only Claim – Blast Furnace Slag Pit Violations

(Operating Permit 85030039; 415 ILCS 5/9(a) and (b))

292. Paragraphs 1 through 79 are realleged and incorporated herein by reference.

293. Condition 1 of Operating Permit 85030039 requires U.S. Steel to conduct water spraying of the slag after completion of the slagging operation and prior to slag load-out for the purpose of cooling and minimizing slag load-out emissions.

294. On January 29, 2009, IEPA notified U.S. Steel that, among other things, U.S. Steel failed to sufficiently apply wetting agent to the slag from Blast Furnace A to minimize the release of fugitive particulate matter emissions to the atmosphere during its loading to trucks. Failure to conduct water spraying of the slag to minimize emissions is a violation of Operating Permit 85030039 and 415 ILCS 5/9(a) and (b).

295. Unless restrained by an Order of the Court, these violations of Operating Permit 85030039 and the Illinois Environmental Protection Act are likely to continue.

296. As provided in Sections 42(a) and (e) of the Illinois Environmental Protection Act, 415 ILCS 5/42(a) and (e), the violations set forth above subject Defendant to injunctive relief and civil penalties of up to $50,000 for each violation and up to an additional $10,000 for each day that the violation has continued.

## PRAYER FOR RELIEF

WHEREFORE, based on the allegations set forth in Paragraphs 1 through 296 above, the

Plaintiffs request that this Court:

1.      Permanently enjoin Defendant from operating the Gary Works, Great Lakes Works and Granite City Works Facilities, including the construction of future modifications or reconstructions, except in accordance with the CAA and any applicable regulatory requirements;

2.      Order Defendant to apply for a PSD and/or NA NSR permit under Parts C and/or D of Title I of the CAA, as appropriate, that conforms to the permitting requirements in effect at the time that Defendant applies for the permit, for each pollutant in violation of the PSD and NA NSR requirements of the CAA;

3.      Order Defendant to remedy its past violations by, among other things, requiring Defendant to install and operate BACT or LAER, as appropriate, at the Gary Works Facility, for each pollutant in violation of the PSD and NA NSR requirements of the CAA;

4.      Order Defendant to achieve, maintain and demonstrate compliance with the CAA and its implementing regulations, including the NESHAP provisions; its Title V Permit or Permit Application requirements for the Gary Works, Great Lakes Works and Granite City Works Facilities; and related SIP requirements for Indiana, Michigan and Illinois;

5.      Order Defendant to take appropriate actions to remedy the violations asserted above and to remedy, mitigate, and offset the harm to public health and the environment caused by the violations of the CAA alleged above;

6.      Order Defendant to comply with Title 13 of the Indiana Code and underlying regulations relating to implementation of the CAA, and relevant State Operating Permits, governing the Gary Works Facility;

7.      Order Defendant to comply with the Illinois Environmental Protection Act and its implementing regulations, and relevant State Operating Permits, governing the Granite City

Works Facility;

8.      Order Defendant to comply with the Michigan's Natural Resources and Environmental Protection Act and its implementing regulations, and relevant State Operating Permits, governing the Great Lakes Works Facility;

9.      Assess a civil penalty against Defendant of up to $25,000 per day for each violation of the CAA prior to January 30, 1997; up to $27,500 per day for each violation of the CAA occurring between January 30, 1997 and March 15, 2004; up to $32,500 for each violation of the CAA occurring between March 16, 2004 and January 12, 2009; and up to $37,500 per day for each such violation occurring after January 12, 2009;

10.     Assess a civil fine against Defendant of up to $10,000 for each violation of Part 55 of NREPA, a rule promulgated under Part 55 of NREPA, and a permit issued under Part 55 of NREPA, and up $10,000 for each day of continued violation;

11.     Assess against Defendant a monetary penalty of up to $50,000 for each violation of the Illinois Environmental Protection Act and implementing regulations, and up to an additional $10,000 for each day that such violations continued, pursuant to Section 42(a) of the Act, 415 ILCS 5/42(a) (2012);

12.     Assess against Defendant, pursuant to IND. CODE § 13-30-4-1, a monetary penalty of not to exceed $25,000 per day of any violation of the air pollution control laws asserted in this civil action;

13.     Award Plaintiffs their costs of this action; and

13.     Grant such other relief as the Court deems just and proper.

Respectfully Submitted,

FOR THE UNITED STATES OF AMERICA

IGNACIA S. MORENO
Assistant Attorney General
Environment and Natural Resources
        Division
United States Department of Justice

ARNOLD S. ROSENTHAL
Senior Attorney
IVA ZIZA
Trial Attorney
Environmental Enforcement Section
Environment and Natural Resources
        Division
United States Department of Justice
P.O. Box 7611
Washington, D.C.  20044
Phone: (202) 514-3446


OF COUNSEL:

SABRINA ARGENTIERI
Associate Regional Counsel
U.S. EPA Region 5
77 W. Jackson Blvd.
Chicago, IL 60604-3590
(312) 886-6082

FOR THE STATE OF INDIANA ON BEHALF OF
THE INDIANA DEPARTMENT OF ENVIRONMENTAL
MANAGEMENT

GREGORY F. ZOELLER
Indiana Attorney General


JUSTIN D. BARRETT
IN #23885-49
Deputy Attorney General
Office of the Indiana Attorney General
Indiana Government Center South
5th Floor
302 West Washington Street
Indianapolis, IN 46204

FOR THE MICHIGAN DEPARTMENT OF
ENVIRONMENTAL QUALITY

BILL SCHUETTE
Attorney General
State of Michigan

NEIL D. GORDON
Assistant Attorney General
Michigan Department of Attorney General
Environment, Natural Resources
and Agriculture Division
P.O. Box 30755
Lansing, Michigan 48909
(517) 373-7540

PEOPLE OF THE STATE OF ILLINOIS,
*ex rel.* LISA MADIGAN,
Attorney General of the State of Illinois

MATTHEW J. DUNN, Chief
Environmental Enforcement/Asbestos
Litigation Division


BY: _____
THOMAS DAVIS, Chief
Environmental Bureau
Assistant Attorney General

OF COUNSEL

RACHEL R. MEDINA #6297171
500 South Second Street
Springfield, Illinois 62706
217/782-9031
Dated: _____7/30/12_____